MECHANICS AND FARMERS SAVINGS BANK, FSB *v.*
DELCO DEVELOPMENT COMPANY, INC., ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE NO. 303743
NEW HAVEN

Memorandum filed August 30, 1993

*Diserio, Martin, O'Connor & Castiglioni,* for the plaintiff.

*Green & Gross,* for the named defendant.

*Weinstein, Weiner & Shapiro,* for the defendant Gary R. Ginsberg.

*Paul M. Kaplan,* for the defendant Robert A. Ginsburg.

*Gager & Henry,* for the defendant Great Country Bank.

*Rogin, Nassau, Caplan, Lassman & Hirtle,* for the defendant Dennis P. Nicotra.

LAGER, J. This action on a note, mortgage and certain guarantees was brought against the defendant Delco Development Company, Inc. (Delco), as principal and Robert A. Ginsburg, Gary R. Ginsberg and Dennis Nicotra as guarantors. The plaintiff seeks, among other things, strict foreclosure of a mortgage on certain undeveloped land located in Hamden. Nicotra was defaulted on December 9, 1991, for failure to disclose a defense. Great Country Bank, a defendant by virtue of a subordinate lien on the mortgaged property, was also defaulted for failure to disclose a defense on December 9, 1991. Delco and Robert Ginsburg and Gary Ginsberg (defendants) answered and pleaded certain identical special defenses.

This action was originally brought by the Mechanics and Farmers Savings Bank, FSB (bank). The Federal Deposit Insurance Corporation (FDIC) was sub-

stituted as the plaintiff by the court, *Celotto, J.*, on March 9, 1992, after it became the receiver of the bank's assets following the bank's failure on August 9, 1991.

The present case was tried before the court on July 20, 21, and 22, and August 6, 1993. The following facts were either admitted[1] or proved by a preponderance of the evidence. On May 17, 1988, Delco borrowed $3,500,000 from the bank executing a variable rate promissory note due on June 1, 1989, secured by a mortgage deed on certain real property known as 249 Putnam Avenue, Hamden. The defendants Robert Ginsburg, Gary Ginsberg and Nicotra, who were shareholders in Delco at the time, each executed an unconditional guarantee to the bank of the principal amount of Delco's note. Each guarantee provided, among other things, for the extension or renewal of the note or its rate of interest without "affecting or releasing the liability of the Guarantor."

On February 21, 1990, the bank agreed to renew what it described as the "Delco Development Company, Inc. Loan #16109," which is the same loan that was the subject of the May 17, 1988 transaction. The renewal was subject to the following conditions: the term of the loan was extended for five years, the interest rate was modified and the repayment terms changed, one point was charged for renewal and outstanding interest through closing had to be paid. On the same date, Delco entered into a modification agreement with the bank that modified and extended the loan evidenced by the note of May 17, 1988, and secured by the mortgage of the same date. Neither a new note nor a new mortgage deed was executed. Each guaran-

---

[1] Delco admitted paragraphs one, two, three and twelve of the complaint, but denied paragraph eight, which alleged default. Robert Ginsburg and Gary Ginsberg admitted paragraph eight and also admitted that certain documents were executed as alleged in paragraphs one through six.

tor, however, executed written consents to the modification that stated, among other things: "Guarantor does hereby guaranty to MECHANICS AND FARMERS SAVINGS BANK FSB, or the holder of the Note, the prompt payment when due at maturity, by acceleration or otherwise, of the principal amount evidenced by the Note, as so modified, or such portion thereof as shall be outstanding, together with interest, reasonable attorney's fees and reasonable costs of collection of said amount, to the same effect as if said Guaranty dated May 17, 1988 had referred to the Note as modified." The modification agreement was recorded on the land records of the town of Hamden on March 1, 1990. Delco has made no payments on the modified loan since April 1, 1990. For the purposes of this decision, the 1988 and 1990 transactions will be referred to collectively as the loan transaction.

The defendants have raised five identical special defenses.[2] The first four special defenses rely on the same facts and allege, respectively, that the loan transaction was ultra vires and unenforceable; that the bank violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and breached its duty of good faith and fair dealing; that the bank was an equity partner or joint venturer with Delco; and that the bank had unclean hands. These defenses are premised on the defendants' claim that the loan transaction was in violation of federal regulation and, therefore, illegal. The fifth special defense alleges that the debt was paid and satisfied. This claim is premised on certain agreements entered into between Nicotra and his creditors, including the bank.

The FDIC has denied the special defenses and claims that they are, in large measure, barred under the doc-

---

[2] A request for leave to amend to add two additional special defenses was denied for the reasons stated on the record on July 20, 1993.

trine of *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S. Ct. 676, 86 L. Ed. 956 (1942), and its progeny, as well as under 12 U.S.C. § 1823 (e). While *D'Oench* and 12 U.S.C. § 1823 (e) create substantial barriers to the successful assertion of defenses in a foreclosure action maintained by the FDIC, as a preliminary matter, the defendants' assertion that the loan transaction was unlawful must be addressed.

The contention at the heart of the first four special defenses is that the bank failed to comply with the requirements of certain federal regulations concerning appraisals and loan to value ratios. Specifically, the defendants claim that the bank did not have a signed appraisal submitted by an appropriately designated appraiser before the 1988 closing in violation of 12 C.F.R. § 545.32 (b) (1)[3] and that the 1990 modification was in excess of authorized loan to value ratios based on the most current appraisal available to the bank in violation of 12 C.F.R. § 545.32 (d).[4]

Given these claims, it is necessary to put the circumstances of the loan transaction into context. The law firm of Ginsberg, Ginsburg and Alderman represented Delco in both 1988 and 1990. The firm had also previously represented Delco in a 1987 closing with the bank of a note and mortgage on the same property.

By 1988, Robert Ginsburg and Gary Ginsberg were Delco stockholders and also had acquired a half interest in a subordinate $1,500,000 mortgage on the Delco property. Robert Ginsburg, according to his testimony,

[3] 12 C.F.R. § 545.32 (1988) provided in pertinent part: "(b) *General*—(1) *Appraisals.* An association may make a real estate loan only after a qualified person designated by its board has submitted a signed appraisal of the security property . . . ."

[4] 12 C.F.R. § 545.32 (1990) provided in pertinent part: "(d) *Loan-to-value ratios.* (1) At the time of origination, a real estate loan may not exceed 100 percent of the market value of the security property."

actively participated in the 1988 loan closing, in the negotiations leading up to the 1990 modification agreement, and in the closing of the modification agreement representing both Delco and his own interests. Robert Ginsburg is a commercial attorney who has practiced in Connecticut since 1967 and has been involved in many loan transactions.

With respect to the 1988 closing, Robert Ginsburg testified that although he understood that the bank was waiving an appraisal, he believed at the time that the transaction was in violation of federal law, assumedly 12 C.F.R. § 545.32 (b), and not enforceable. Nonetheless, his law firm issued an opinion letter to the bank after deletion of any language indicating that the loan documents conformed to federal law.

Five documents involving appraisals of the subject property were located in the files of the bank and its successor, the Consolidated Asset Recovery Corporation (the corporation). The parties stipulated that the following were in the files: (1) an appraisal dated December 10, 1986, from Estrada & Associates (Estrada); (2) an appraisal as of July 1, 1988, dated July 20, 1988, also from Estrada; (3) a letter dated October 27, 1989, from Estrada updating the July 1, 1988 appraisal (Estrada letter); (4) an appraisal dated September 30, 1989, from New England Real Estate Analysts; and (5) an appraisal dated September 8, 1992, prepared by Timothy Girian.

With respect to the 1990 modification, Robert Ginsburg testified that he had participated in discussions with officials of the bank concerning the value of the mortgaged property. He stated that based on an appraisal that the bank had obtained in the fall of 1989, the bank was seeking a significant paydown or to call the loan. In response, Nicotra indicated that he would obtain an updated appraisal but that he was only able

to procure a letter from Arthur Estrada, who had previously appraised the property. Robert Ginsburg presented this letter to the bank after it agreed to accept it. According to Scott Smith, a representative of the corporation who was familiar with the loan transaction, the value stated in this document supports a loan to value ratio of 73 percent at the time of the modification, which would be within the limits of 12 C.F.R. § 545.32 (d).

Assuming, arguendo, that 12 C.F.R. § 545.32 (b) (1) and (d) apply to the loan transaction between the bank and the defendants,[5] the defendants' great reliance on the alleged regulatory violation is misplaced. The principle that a bank's violation of regulatory provisions in making a loan neither precludes recovery on the loan nor provides a defense, unless specifically provided by statute, has been established for well over 100 years. See, e.g., *Gold-Mining Co.* v. *National Bank,* 96 U.S. 640, 642, 24 L. Ed. 648 (1877); annot., 125 A.L.R. 1512 (1940). Indeed, as the Supreme Court stated in 1892, "[I]t has been held repeatedly by this court that where the provisions of the national banking act prohibit certain acts by banks or their officers, without imposing any penalty or forfeiture applicable to particular transactions which have been executed, their validity can be questioned only by the United States and not by private parties. *National Bank* v. *Matthews,* 98 U.S. 621 [25 L. Ed. 188 (1879)]; *National Bank* v. *Whitney,* 103 U.S. 99 [26 L. Ed. 443 (1880)]; *National Bank of Xenia*

---

[5] Section 545.32 of title 12 of the Code of Federal Regulations governs real estate loans made by a federal savings and loan association or a federal savings bank pursuant to statutory authorization found in 12 U.S.C. § 1464 (c) (1) (B). According to John Tranquilli, the bank's loan officer involved in the commitment for the 1988 note and mortgage, the loan was considered a commercial loan on demand partially secured by real estate. If that were the case, the loan would have been made pursuant to the provisions of 12 U.S.C. § 1464 (c) (1) (R) and would not be subject to the regulations contained in 12 C.F.R. § 545.32.

v. *Stewart,* 107 U.S. 676 [2 S. Ct. 778, 27 L. Ed. 592 1882)]." *Thompson* v. *Saint Nicholas National Bank,* 146 U.S. 240, 251, 13 S. Ct. 66, 36 L. Ed. 956 (1892).

Section 545.32 governs certain real estate loans originated under the provisions of the Home Owners' Loan Act of 1933, 12 U.S.C. § 1461 et seq., as amended. That act and its underlying regulations provide for the establishment and government of authorized federal savings and loan associations and federal savings banks. The provisions of the act and the regulations are enforceable against authorized associations solely through the regulatory process. The law was not enacted for the special benefit of mortgagors. *Taylor* v. *Citizens Federal Savings & Loan Assn.,* 846 F.2d 1320, 1322–23 (11th Cir. 1988). "The broad language of [the act] expresses no limits on the Board's authority to regulate the lending practices of federal savings and loans." *Fidelity Federal Savings & Loan Assn.* v. *De La Cuesta,* 458 U.S. 141, 161, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982). The detailed administrative scheme of enforcement set forth in 12 U.S.C. § 1464 (d) strongly evidences congressional intent for an exclusive administrative remedy for violations of the act and its regulations. See *Till* v. *Unifirst Federal Savings & Loan Assn.,* 653 F.2d 152, 160 (5th Cir. 1981).

Thus, any purported violation of the regulations by the bank with respect to the loan transaction did not make the loan void against Delco, preclude the bank from seeking to recover on the note or guarantees, or provide a defense to the foreclosure action. Furthermore, as a general matter, it would violate public policy to allow a borrower who has benefited by obtaining an allegedly unauthorized loan to avoid its obligation of repayment, in reliance on regulations designated to protect the financial institution, to the lending institution's further detriment.

This is particularly so in light of the facts of the present case where Robert Ginsburg, concededly the attorney for at least himself and Delco, knowingly entered into the 1988 transaction believing it to be unenforceable for violations of federal law and, with respect to the 1990 modification, actively participated in the bank's reliance on the Estrada letter which supported an authorized loan to value ratio. Indeed, these facts reveal a scheme or arrangement, in which the borrower and guarantors participated, that would have the effect of deceiving the regulatory authorities. The FDIC rightly relies on the *D'Oench* doctrine and on 12 U.S.C. § 1823 (e) under these circumstances to defeat the first four special defenses.

The common law *D'Oench* doctrine and 12 U.S.C. § 1823 (e) bar the assertion against the FDIC of any defense premised on any unrecorded agreement between the borrower and a failed institution that does not satisfy all four requirements of § 1823 (e).[6] The term "agreement" under the common law and as used in § 1823 (e) is defined broadly to include all conditions upon performance; *Langley* v. *Federal Deposit Ins. Corp.,* 484 U.S. 86, 91, 108 S. Ct. 396, 98 L. Ed. 2d 340 (1987); and any "scheme or arrangement that is likely to mislead the banking authorities." Id., 93;

---

[6] 12 U.S.C. § 1823 (e) (1991 Sup.) provides, in pertinent part:

"No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it . . . shall be valid against the Corporation unless such agreement—

"(1) is in writing,

"(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

"(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

"(4) has been, continuously, from the time of its execution, an original record of the depository institution."

*D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* supra, 315 U.S. 460.

While the statute only "partially" codifies the *D'Oench* doctrine; see *Vernon* v. *Resolution Trust Corp.,* 907 F.2d 1101, 1105 (11th Cir. 1990); "courts have found the aims of section 1823 (e) and *D'Oench* identical and thus have construed defenses premised upon section 1823 (e) and *D'Oench* in tandem." *Twin Construction, Inc.* v. *Boca Raton, Inc.,* 925 F.2d 378, 382 (11th Cir. 1991). "The *D'Oench* doctrine has been extended through the development of federal common-law to apply to situations other than those involving secret agreements. See *Vernon* v. *Resolution Trust Corp.,* [supra, 1106]. . . . Personal guaranties have been among the assets affected by the doctrine. See *Twin Construction, Inc.* v. *Boca Raton, Inc.,* [supra, 382]. Section 1823 (e) itself has been interpreted to prohibit the assertion against the FDIC of bank misrepresentations inducing the execution of a note and guaranty. See *Langley* v. *Federal Deposit Ins. Corp.,* [supra, 484 U.S. 91–93]." *Federal Deposit Ins. Corp.* v. *Bernstein,* 944 F.2d 101, 108 (2d Cir. 1991).

Courts have applied the common law and § 1823 (e) to protect the FDIC from a variety of claims including those premised on secret agreements, unwritten agreements, fraud in the inducement, state and common law fraud, alleged violations of federal securities laws and other federal statutes, and certain affirmative defenses. See *NCNB Texas National Bank* v. *King,* 964 F.2d 1468, 1470–71 (5th Cir. 1991); *Twin Construction, Inc.* v. *Boca Raton, Inc.,* supra, 925 F.2d 382, and cases cited therein; *Kilpatrick* v. *Riddle,* 907 F.2d 1523, 1528–29 (5th Cir. 1990), cert. denied sub nom. *Rogers* v. *Federal Deposit Ins. Corp.,* 498 U.S. 1083, 111 S. Ct. 954, 112 L. Ed. 2d 1042 (1991); *Vernon* v. *Resolution Trust Corp.,* supra, 907 F.2d 1105–1106 (and cases cited therein). "The *D'Oench* doctrine . . . estops a party

from asserting any claim against the FDIC based on oral representations, agreements, or conditions that are not reflected in the books and records of the failed bank." *First City National Bank* v. *Federal Deposit Ins. Corp.,* 730 F. Sup. 501, 510 (E.D.N.Y. 1990).

Here, the defense of illegality is premised on agreements not reflected in the books and records of the bank. Further, the evidence in the present case leaves no doubt that if the bank violated federal regulations when it agreed in 1988 to waive a required appraisal and when it agreed in 1990 to accept the Estrada letter, again in lieu of a required appraisal, it did so with the acquiescence, if not the full participation, of the defendants. The fact that certain appraisals and the Estrada letter appear in the bank's files, without more, does not satisfy the requirements of 12 U.S.C. § 1823 (e). The understandings that the bank would waive an appraisal in 1988 and accept the Estrada letter in 1990 were not memorialized in the parties' written agreement, which is the integration of the note, mortgage, guarantees, modification agreement, and consents of guarantors. See *In re Greenwich Showboat Ltd. Partnership,* 117 Bankr. 54, 57 (D. Conn. 1990), citing *Schubert* v. *Ivey,* 158 Conn. 583, 587, 264 A.2d 562 (1969). As the court in *D'Oench* stated: "If the . . . agreement were allowed as a defense in this case the maker of the note would be enabled to defeat the purpose of the statute by taking advantage of an undisclosed . . . arrangement which the [regulation] condemns and which the maker of the note made possible." *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.,* supra, 315 U.S. 461.

This is not to suggest that either the bank or the defendants intended to deceive the regulatory authority by the manner in which this loan transaction was conducted. "Neither the intent to deceive nor fraud are requisites for the application of *D'Oench.* . . . 'The

statute and the cases only require that [a party] lend himself "to a scheme or arrangement whereby the banking authority . . . was or was likely to be misled." ' . . . Such a party 'cannot rely upon that same scheme or arrangement to defend against the banking authority's subsequent actions.' " (Citations omitted.) *Twin Construction, Inc.* v. *Boca Raton, Inc.,* supra, 925 F.2d 382.

Since the claim of illegality constituting the first special defense fails here, so do the second, third and fourth special defenses, which are premised on precisely the same facts and also fall outside the express provisions of the parties' written agreement. *Federal Deposit Ins. Corp.* v. *Vernon Real Estate Investments, Ltd.,* 798 F. Sup. 1009, 1015 (S.D.N.Y. 1992). The defendants cannot convert a defense that fails *D'Oench* into one that survives it simply by describing it differently. See *Citytrust* v. *Allen,* United States District Court, Docket No. 5:91CV00597 EBB (D. Conn. July 8, 1993).

The second special defense asserts violations of the covenant of good faith and fair dealing and CUTPA. While courts have recognized that under certain circumstances the *D'Oench* doctrine would not necessarily bar a claim of breach of the covenant of good faith and fair dealing; see *Federal Deposit Ins. Corp.* v. *P.P.S. Associates,* United States District Court, Docket No. 5:91CV00518EBB (D. Conn. September 25, 1992); and CUTPA violations; *Connecticut Bank & Trust Co.* v. *Lee,* Superior Court, judicial district of Stamford-Norwalk, Docket No. 11137 (April 15, 1992) (7 C.S.C.R. 1137); the second special defense is not supported by any evidence, other than the bank's alleged violation of federal regulation, which establishes bad faith; see *Magnan* v. *Anaconda Industries, Inc.,* 193 Conn. 558, 568 n.18, 479 A.2d 781 (1984); or a

CUTPA violation. See e.g., *Sportsmen's Boating Corp.* v. *Hensley,* 192 Conn. 747, 756, 474 A.2d 780 (1984).

Likewise, the third special defense attempts to convert the allegation of illegality into a claim that the bank was an equity partner or joint venturer with the defendants. It is, of course, axiomatic that by filing a special defense the defendants assume the burden of proving it. See, e.g., *Atlantic Richfield Co.* v. *Canaan Oil Co.,* 202 Conn. 234, 237, 520 A.2d 1008 (1987). There was no evidence introduced upon which it can be found that the lender-borrower-guarantor relationship between the bank and the defendants was at any time transformed into a partnership or joint venture. See *Tuxedo Beach Club Corp.* v. *City Federal Savings Bank,* 749 F. Sup. 635, 646 (D.N.J. 1990). Furthermore, any claim of equity partnership or joint venture premised on either oral agreements among the defendants and officers of the bank or the conduct of bank officials alone is barred by the *D'Oench* doctrine and 12 U.S.C. § 1823 (e). See *Resolution Trust Corp.* v. *Wellington Development Group,* 761 F. Sup. 731, 735–37 (D. Colo. 1991).

The fourth special defense again relies on the claimed violation of federal regulation but alleges unclean hands. The defense of unclean hands to a mortgage foreclosure has generally been disallowed in this state. See, e.g., *Northeast Savings, F.A.* v. *Dunst,* Superior Court, judicial district of Stamford-Norwalk, Docket No. 117332 (April 15, 1992) (7 C.S.C.R. 527); *New England Savings Bank* v. *High Ridge, Inc.,* Superior Court, judicial district of Norwich, Docket No. 97113 (November 4, 1991) (5 Conn. L. Rptr. 110). Furthermore, the "clean hands doctrine is applied not for the protection of the parties but for the protection of the court." *Pappas* v. *Pappas,* 164 Conn. 242, 246, 320 A.2d 809 (1973). The facts and equities of the present case

do not require the court to deny the plaintiff relief "to protect its own integrity." Id.

The fifth special defense is one of payment. Payment, discharge, release or satisfaction are recognized defenses at common law to an action on a note and mortgage. *Petterson* v. *Weinstock,* 106 Conn. 436, 441, 138 A.2d 433 (1927); *Danbury Savings & Loan Assn., Inc.* v. *Natale,* Superior Court, judicial district of Danbury, Docket No. 305410 (October 23, 1992) (7 C.S.C.R. 1286). The defendants rely upon an agreement entered into between Nicotra and his creditors, including the bank, which addressed, among other things, the Delco mortgage. There is simply no legal or equitable basis, however, upon which the defendants can argue that an agreement negotiated by Nicotra to satisfy his debts, which apparently failed in the end, is applicable to them. See *Federal Deposit Ins. Corp.* v. *Mr. T's, Inc.,* 764 F. Sup. 1087, 1089 (M.D. La. 1991).

Furthermore, since the defendants are claiming the benefit of the Nicotra satisfaction agreement, it must meet all the requirements of 12 U.S.C. § 1823 (e). Under that section, unless the party claiming the benefit of an agreement can establish that it had a written agreement with the bank that was an original record of the bank executed "contemporaneously with the acquisition of the asset" approved by the bank's board of directors or loan committee and reflected in the appropriate minutes, the agreement is not valid against the FDIC. The Nicotra satisfaction agreement, even when viewed in light of the intercreditor agreement, fails to meet all of these conditions and cannot be asserted against the FDIC. *Langley* v. *Federal Deposit Ins. Corp.,* supra, 484 U.S. 95.

First, the defendants Delco, Robert Ginsburg and Gary Ginsberg did not execute the agreement. See *Twin Construction, Inc.* v. *Boca Raton, Inc.,* supra, 925

F.2d 384 n.5; *Federal Deposit Ins. Corp.* v. *Rivera-Arroyo,* 907 F.2d 1233, 1236 (1st Cir. 1990). Second, the agreement was executed on July 24, 1991, and, therefore, not contemporaneously with the asset being foreclosed, that is, the 1988 note and mortgage as modified in 1990. See *Federal Deposit Ins. Corp.* v. *Wright,* 942 F.2d 1089, 1100 (7th Cir. 1991), cert. denied, 504 U.S. 909, 112 S. Ct. 1937, 118 L. Ed. 2d 544 (1992); *Federal Deposit Ins. Corp.* v. *Manatt,* 922 F.2d 486, 489–90 (8th Cir.) (Gibson, J., concurring), cert. denied, 501 U.S. 1250, 111 S. Ct. 2889, 115 L. Ed. 2d 1054 (1991); *Resolution Trust Corp.* v. *Crow,* 763 F. Sup. 887, 892–94 (N.D. Tex. 1991); *Federal Deposit Ins. Corp.* v. *Friedland,* 758 F. Sup. 941, 943 (S.D.N.Y. 1991). Third, the only evidence that the agreement was approved by the bank was the testimony of Nicotra's attorney that he saw what purported to be the approval of a committee of the bank's board. Even if the court could infer from this testimony that the agreement was approved as required by § 1823 (e) (3), the court cannot infer that such approval is reflected in the appropriate minutes. The actual minutes were not offered into evidence. See *Federal Deposit Ins. Corp.* v. *Manatt,* supra, 489; *Federal Deposit Ins. Corp.* v. *P.L.M. International, Inc.,* 834 F.2d 248, 253 (1st Cir. 1987). Thus, the fifth special defense also fails.

In sum, all five special defenses have failed and the evidence has established that the 1988 note and mortgage, the 1988 guarantees, the 1990 modification agreement and the 1990 consent of guarantors were properly executed and Delco has been in default since April 19, 1990. The FDIC, therefore, is entitled to judgment on the outstanding principal amount of $3,500,000 plus interest.

Since the note and modification agreement both provided for interest to accrue according to a formula employing the "Prime Rate of Mechanics and Farmers

Savings Bank, FSB," a failed institution, the court must determine a reasonable rate of interest by examining the documents and testimony to determine the parties' intent. See *Federal Deposit Ins. Corp.* v. *Blanton,* 918 F.2d 524, 532 (5th Cir. 1990); *Federal Deposit Ins. Corp.* v. *La Rambla Shopping Center,* 791 F.2d 215, 223 (1st Cir. 1986); *Federal Deposit Ins. Corp.* v. *Cage,* 810 F. Sup. 745, 747 (S.D. Miss. 1993). The note and modification agreement provided for a varying rate of interest which was "not necessarily the lowest or most favorable" offered by the bank. Further, both documents provided that if the bank "change[d] its name, merge[d] with another institution or otherwise alter[ed] its corporate identity, the term 'Mechanics and Farmers Savings Bank FSB' . . . shall be deemed to refer to its successor." Lynn Quido, the corporation's chief financial and administrative officer, testified that she was instructed to use the prime rate of the successor bank, Chase Manhattan Bank of Connecticut, in connection with the loan transaction and that it is a routine practice to use the prime rate of a successor bank.

The court finds that the substitution of the prime rate of the successor bank is reasonable under the circumstances of the present case and will calculate interest based on the figures submitted by the plaintiff. Exhibit Q indicates interest calculated on the principal amount of $3,500,000 through July 19, 1993, in the amount of $1,165,840.28 and accruing at a per diem rate of $777.7778. Interest as of the date of this decision totals $1,198,506.95. The court, therefore, finds the debt as of the date of this decision to be $4,698,506.95.

The parties stipulated that for the purposes of this hearing the appraiser could testify through oath and affidavit of appraiser. Accordingly, an oath and affidavit of appraiser, with attached appraisal report, were submitted stating a fair market value of the subject

property of $1,545,000. The court finds, therefore, for the purposes of this hearing that the fair market value of the subject property consisting of 10.55 acres of unimproved land is $1,545,000.

Accordingly, since the debt far exceeds the fair market value of the property, a judgment of strict foreclosure shall enter. The following fees are awarded: a title search fee in the amount of $150, an appraisal fee in the amount of $3000, and attorney's fees in accordance with the amount requested in the affidavit in support of request for attorney's fees dated August 3, 1993, and filed August 6, 1993. The first law day is set on November 9, 1993, and on succeeding banking days for subsequent encumbrancers in inverse order of their priorities.