FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER OF NEW CONNECTICUT BANK AND TRUST COMPANY, N.A. *v.* NAPERT-BOYER PARTNERSHIP ET AL.
(14230)

Foti, Lavery and Landau, Js.

Argued September 21, 1995—decision released February 27, 1996

*Raymond L. Baribeault, Jr.,* with whom, on the brief, were *Andrew J. Brand* and *S. Joel Suisman,* for the appellants (named defendant et al.).

*John J. Graubard,* with whom, on the brief, was *Thomas R. Legenhausen,* for the appellee (plaintiff).

LAVERY, J. This is an appeal by the defendants[1] from a judgment on two promissory notes for $12,301,165.61. The notes called for a variable interest rate of 1 percent above the prime rate of Connecticut Bank and Trust Company (CBT). The defendants claim that the trial court improperly (1) substituted the prime rate of Fleet Financial Group for the prime rate of the failed CBT, (2) found that a prior foreclosed $1 million mortgage did not merge with the two notes in question and that General Statutes § 49-1[2] did not prevent the plaintiff from seeking a judgment on the mortgage debt, (3) found that the defendants were liable for late fees after acceleration, and (4) found that the defendants' special defenses, claims of setoffs and counterclaim for damages were not supported by the evidence and were barred by the doctrine in *D'Oench, Duhme & Co.*[3] We agree with the defendants that the plaintiff did not prove that the substitution of the prime rate of Fleet Bank was reasonable and that the trial court's use of judicial notice was improper. We also conclude that there was no evidence of how the interest rate was calculated during the period that New Connecticut Bank and Trust Company, N.A. (New CBT), existed, and that late charges should not have been assessed against the

---

[1] The defendants in this appeal are Napert-Boyer Partnership and George Boyer.

[2] General Statutes § 49-1 provides: "The foreclosure of a mortgage is a bar to any further action upon the mortgage debt, note or obligation against the person or persons who are liable for the payment thereof who are made parties to the foreclosure and also against any person or persons upon whom service of process to constitute an action in personam could have been made within this state at the commencement of the foreclosure; but the foreclosure is not a bar to any further action upon the mortgage debt, note or obligation as to any person liable for the payment thereof upon whom service of process to constitute an action in personam could not have been made within this state at the commencement of the foreclosure. The judgment in each such case shall state the names of all persons upon whom service of process has been made as herein provided."

[3] See *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S. Ct. 676, 86 L. Ed. 956 (1942).

defendants once the notes were accelerated. Accordingly, we reverse the judgment of the trial court and remand the matter for further proceedings.

The trial court found the following facts. On or about August 26, 1988, the defendant Napert-Boyer Partnership (Napert-Boyer) entered into a construction loan agreement with CBT for $8.8 million to construct a condominium in Groton. The loan was evidenced by a promissory note that was secured by a first mortgage on the property. Napert-Boyer experienced problems with the project and, at its request, the parties executed a loan modification agreement in October, 1989.

Pursuant to the loan modification agreement, CBT provided Napert-Boyer with an additional $1 million revolving line of credit. Napert-Boyer and the defendant George Boyer, individually, executed a $1 million promissory note in favor of CBT and granted it a second mortgage on the project. Boyer became a comaker on the $8.8 million loan, and CBT also refinanced a personal line of credit to Boyer who executed a $300,000 promissory note in favor of CBT. Upon default by the defendants, CBT instituted proceedings in June, 1990, to foreclose the second mortgage and to obtain judgment on the $300,000 note executed by Boyer.

On January 6, 1991, CBT became insolvent and the Federal Deposit Insurance Corporation (FDIC) was appointed receiver of CBT. The FDIC, pursuant to 12 U.S.C. § 1821 (n), conveyed CBT's assets to a bridge bank,[4] New CBT. On July 11, 1991, the FDIC dissolved

---

[4] Section 1821 (n) of title 12 of the United States Code authorizes the FDIC to create "bridge banks" out of institutions that it deems to be in default or that it anticipates will be in default. A bridge bank is a temporary institution that serves as a vehicle to smooth the transition of a failed institution so that the FDIC need not immediately put an institution into receivership and pay out on insured deposits if there is a possibility that a buyer for the assets may emerge. *Jones* v. *Resolution Trust Corp.*, 7 F.3d 1006, 1016 (11th Cir. 1993).

New CBT, took control of its assets, and was substituted as the plaintiff in this action.[5]

In 1991, the FDIC obtained a judgment of strict foreclosure on the $1 million second mortgage, which was affirmed by this court. See *Connecticut Bank & Trust Co., N.A.* v. *Napert-Boyer Partnership*, 29 Conn. App. 901, 614 A.2d 493 (1992), cert. denied, 224 Conn. 924, 618 A.2d 530 (1993). Titled vested in the plaintiff as receiver on March 30, 1993. The FDIC moved for a deficiency judgment. The parties resolved the deficiency judgment motion by stipulating that the value of the property was equal to the sum of the debt due on the $1 million note and mortgage, plus the outstanding real estate taxes due on the property. In November, 1993, the FDIC amended its complaint seeking to recover on the $8.8 million note and on the $300,000 note. The trial court rendered judgment in favor of the FDIC.

The trial court found that it was commercially reasonable for the FDIC to substitute the prime rate of Fleet Financial Group for the prime rate of the defunct CBT. The trial court also found that the $8.8 million note represented a separate obligation and transaction from the $1 million note that was secured by the foreclosed mortgage, and that General Statutes § 49-1 did not apply. Finally, the trial court held that the defendants' special defenses and counterclaims were not supported by the evidence and that the defendants' claim of setoff was barred by the prior stipulation on the motion for deficiency judgment on the $1 million loan.[6]

---

[5] The trial court stated in its memorandum of decision that the FDIC dissolved New CBT on January 11, 1991. This was simply a scrivener's error.

[6] The trial court rendered judgment on the $8.8 million loan as follows: principal $7,608,714.42; interest $3,432,843.97; default interest $594,148.45; and late charges $180,730.90, for a total of $11,816,437.74. On the $300,000 note, the court rendered judgment as follows: principal $300,000; interest $136,584.31; default interest $43,925; and late charges $4218.56, for a total of $484,727.87.

## I

The defendants first claim that the trial court incorrectly substituted the prime rate of the Fleet Financial Group for the prime rate of the failed CBT. The trial court found that the FDIC appropriately substituted a commercially reasonable prime rate. In its response to a motion for articulation, the trial court stated that one of the plaintiff's witnesses "testified that in substituting an interest rate for that of the failed CBT, FDIC as receiver utilized the published prevailing prime rate of Fleet Financial Group. The court takes judicial notice of the fact that Fleet Financial Group is a major bank holding company with many of the banks under its aegis located in this region of the country. To substitute an interest rate based on that then being utilized by a comparable commercial lending institution appears to be a logical, fair and reasonable procedure. The defendant has offered no evidence to the contrary." We agree with the defendant and conclude that the trial court improperly took judicial notice of these facts.

"When a variable interest rate is based on the rate of a failed institution, the trial court must determine whether the substitute rate is reasonable by examining the documents and testimony offered by the plaintiff. See *Federal Deposit Ins. Corp.* v. *Blanton*, 918 F.2d 524, 532 (5th Cir. 1990); *Federal Deposit Ins. Corp.* v. *La Rambla Shopping Center*, 791 F.2d 215, 223 (1st Cir. 1986); *Federal Deposit Ins. Corp.* v. *Cage*, 810 F. Sup. 745, 747 (S.D. Miss. 1993)." *Central Bank* v. *Colonial Romanelli Associates*, 38 Conn. App. 575, 578, 662 A.2d 157 (1995); see also *Mechanics & Farmers Savings Bank, FSB* v. *Delco Development Co.*, 232 Conn. 594, 597–98, 656 A.2d 1034 (1995).[7]

---

[7] The Supreme Court opinion incorporates the trial court opinion *Mechanics & Farmers Savings Bank, FSB* v. *Delco Development Co.*, 43 Conn. Sup. 408, 422–23, 656 A.2d 1075 (1995).

In *Federal Deposit Ins. Corp.* v. *M.F.P. Realty Associates*, 870 F. Sup. 451, 456 (D. Conn. 1994), a case similar to this case, the United States District Court in Connecticut stated: "[F]ederal law, which now governs this action, supports the conclusion that the FDIC is empowered and entitled to establish an alternate prime rate. See, e.g., *United States* v. *Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S. Ct. 1448, 1457, 59 L. Ed. 2d 711 (1979) ('This Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs.'); *Linde Thomson Langworthy Kohn & Van Dyke, P.C.* v. *RTC*, 5 F.3d 1508, 1512–13 (D.C. Cir. 1993) (Federal law applies to claim of attorney-client privilege where RTC filed petition to enforce subpoena duces tecum issued to former law firm which had connections to failed thrift.) Under 12 U.S.C. § 1821 (d) (2) (B) (ii), the FDIC, as receiver, assumes the ability to 'perform all functions of the institution in the name of the institution which is consistent with the appointment as conservator or receiver . . . .' In the instant case, one such right must necessarily include the right to establish a prime rate called for under the failed institution's note.

"Accordingly, several courts which have considered the issue have approved the use of the prime rate of another bank when a note becomes the asset of the FDIC. See *FDIC* v. *Condo Group Apartments*, 812 F. Supp. 694, 699 (N.D. Tex. 1992). Likewise, this Court already has found that the FDIC may substitute an appropriate interest rate to apply to a loan that is based upon the prime rate of a failed bank. See, e.g., *FDIC* v. *272 Post Road Associates*, Recommended Ruling on Plaintiff's Motion for Summary Judgment of Strict Foreclosure, Civil No. 5:91CV433(TFGD) (D. Conn. March 11, 1994); accord *FDIC* v. *Rogers Park I*, 1990 WL 482141 (W.D. Okl. 1990) (Under Restatement [Second] of Contracts § 204, when parties have not agreed with respect

to an essential contract term, the Court may supply one which is reasonable under the circumstances.)"

An examination of the evidence and exhibits presented in this case shows that the FDIC used the prime rate of Fleet Financial Group from the time the FDIC took over from New CBT. There is no evidence in the record pertaining to the interest rate used during the time New CBT existed. There was testimony that Recall Management Corporation, FDIC's attorney in fact, was a wholly owned subsidiary of Fleet Financial Group, and that, in calculating the interest rate, it used the prime rate of its parent company Fleet. We find that there is no evidence in the record from which the trial court could have ascertained the reasonableness of the substitute rate. See *Central Bank* v. *Colonial Romanelli Associates*, supra, 38 Conn. App. 578.

The trial court took judicial notice that Fleet Financial Group is a major bank holding company with many of its banks located in the region, and that, because Fleet Financial Group is a comparable commercial lending institution, the use of its prime rate appeared to be logical, fair and reasonable. The court also noted that the defendants offered no evidence to the contrary. The trial court, however, gave no notice to the parties that it was going to take judicial notice of the status of Fleet Financial Group as a comparable bank and the fact that its prime rate was a reasonable substitution.

In a civil action, the plaintiff has the burden of proving its case by a preponderance of the evidence. *Busker* v. *United Illuminating Co.*, 156 Conn. 456, 458, 242 A.2d 708 (1968). "Judicial notice relieves a party only of having to offer proof on the matter; it does not constitute conclusive proof of the matter nor is the opposing party prevented from offering evidence disputing the matter established by judicial notice." *In re Mark C.*, 28 Conn. App. 247, 252, 610 A.2d 181, cert. denied, 223

Conn. 922, 614 A.2d 823 (1992). The trial court must give the parties an opportunity to be heard prior to taking such notice. *State* v. *Zayas*, 195 Conn. 611, 615, 490 A.2d 68 (1985); *Moore* v. *Moore*, 173 Conn. 120, 122, 376 A.2d 1085 (1977). Lack of notice prevents a party from disputing the judicially noticed fact. *State* v. *Marshall*, 11 Conn. App. 632, 634–35, 528 A.2d 1163 (1987).

"Courts may take judicial notice of 'matters which come to the knowledge of men generally in the course of the ordinary experience of life, and are therefore in the mind of the trier, or they may be matters which are generally accepted by mankind as true and are capable of ready and unquestionable demonstration.'" *West Hartford* v. *Freedom of Information Commission*, 218 Conn. 256, 264, 588 A.2d 1368 (1991), quoting *Roden* v. *Connecticut Co.*, 113 Conn. 408, 415, 155 A. 721 (1931). "Facts which are of common knowledge, that is, facts so well known that evidence to prove them is unnecessary are proper subjects of judicial notice." *State* v. *Marshall*, supra, 11 Conn. App. 634; see generally 1 B. Holden & J. Daly, Connecticut Evidence (1988) §§ 21 through 33. While some facts, such as the time of the rising or setting of the sun on a given day, are the proper subject for judicial notice; *State* v. *Morris*, 47 Conn. 179, 180 (1879); other facts, such as the reliability of DNA typing, are too novel to be judicially noticed. *State* v. *Hammond*, 221 Conn. 264, 280–81 n.8, 604 A.2d 793 (1992).

We hold that whether a financial institution is comparable to another financial institution and, based on that comparison, whether a substituted interest rate is reasonable is not the proper subject matter of judicial notice. Those facts are in dispute and the burden is placed on the plaintiff to present evidence showing that substituted rate was reasonable. In addition, the trial court gave no notice to the parties that it intended to take judicial notice of these facts. The defendants were

denied the opportunity to be heard and to dispute the reasonableness of the interest rate by offering their own evidence.

## II

The defendants next claim that the trial court should not have assessed late fees against them through the date of the trial, but rather that late fees should be charged only until the day on which the notes were accelerated. We address this issue because it is likely to arise on remand. We agree with the defendants that the trial court should not have assessed late fees against them after the notes were accelerated.

The language contained in the notes provides that "[i]n the event of default in any monthly installment, Maker agrees to pay Holder a late charge equal to five percent (5%) of said monthly installment." Although there is no finding by the trial court of the date of acceleration, it had to be, at the very latest, in June, 1990, when this action was originally instituted. We agree with the reasoning of the District Court in *Federal Deposit Ins. Corp.* v. *M.F.P. Realty Associates*, supra, 870 F. Sup. 455, which held that a plaintiff may not recover late charges once the note has been accelerated and demand for payment has been made on the defendants. That court reasoned that "while a note may provide for a lender to collect late charges when an installment is not received by a due date, those installments are no longer 'due' after the lender has accelerated the note and made demand upon the borrower." Id.

The reasoning of the District Court rings true especially in this case because both notes provide for an increase in interest upon default, from 1 percent above prime to 3 percent above prime. If the late charges are allowed to continue after demand for payment in full upon default, it would, in effect, become a penalty since the plaintiff is being compensated for the default by

the higher interest rate. See annot., 63 A.L.R.3d 50 (1975). We conclude, therefore, that the trial court improperly assessed late fees against the defendants through the date of the trial.

### III

The defendants next claim that the $8.8 million note and mortgage merged with the $1 million note and mortgage, and any further action on the $8.8 million note was barred by § 49-1. Because this issue is likely to arise on remand, we will address its merits. Section 49-1 provides in pertinent part: "The foreclosure of a mortgage is a bar to any further action upon the mortgage debt, note or obligation against the person or persons who are liable for the payment . . . ."

The trial court found that the defendants did not raise this argument in any of their responsive pleadings, and it was untimely. The trial court further stated that even if the issue had been properly pleaded, it was not supported by the evidence adduced at trial. The court found that the two notes were separate and distinct obligations and transactions, and that there was no waiver by the plaintiff of its rights to collect on the $8.8 million note when it foreclosed on the $1 million note and mortgage. We agree with the trial court.

Practice Book § 164 provides: "No facts may be proved under either a general or special denial except such as show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that he has no cause of action, must be specially alleged. Thus, accord and satisfaction, arbitration and award, coverture, duress, fraud, illegality not apparent on the face of the pleadings, infancy, that the defendant was non compos mentis, payment (even though nonpayment is alleged by the plaintiff), release, the statute of limitations and res judicata must be specially pleaded, while advantage

may be taken, under a simple denial, of such matters as the statute of frauds, or title in a third person to what the plaintiff sues upon or alleges to be his own."

"The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. Practice Book § 164. The claim that a plaintiff has elected an exclusive remedy relies on facts outside those alleged in the complaint that operate to negate what may once have been a valid cause of action. 1 E. Stephenson, Connecticut Civil Procedure (2d Ed.) § 127, p. 519. It is therefore both rational and fair to place the burden of pleading and proving an election of remedies on the party asserting the claim, usually the defendant. 'It is sufficient to require the plaintiff to allege facts showing that at one time, at least, he had a cause of action. It would be an undue burden to require him to negate the occurrence of any and all subsequent events that could operate to destroy his cause of action.' Id." *Grant* v. *Bassman*, 221 Conn. 465, 472–73, 604 A.2d 814 (1992). Since the answer did not allege a special defense of § 49-1, the trial court properly held that the defendants could not assert it at trial.

In addition, a review of the transcript and the record shows that there was substantial evidence on which the trial court could find that the notes were separate and distinct. Appellate courts do not disturb the facts as found by the trial court unless the finding of facts is clearly erroneous. See Practice Book § 4061; *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

## IV

The defendants' final claim is that the trial court incorrectly found that their special defenses, their claims of setoff and their counterclaim were not supported by the evidence and were bound by the doctrine

in *D'Oench, Duhme & Co.*,[8] or by 12 U.S.C. § 1823 (e) (1994). Because the trial court will be faced with this issue on remand, we will address the trial court's previous decision.

The trial court found, assuming hypothetically that the doctrine in *D'Oench, Duhme & Co.*, does not bar the special defenses, that the defendants did not sustain their burden of proof on the special defenses, counterclaim and setoff and made specific factual findings in support of its conclusions. A review of the record and transcript shows that the factual findings of the court are not clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester*, supra, 181 Conn. 221–22. We agree with the trial court's conclusion that the defendants failed to sustain their burden of proof on the special defenses, setoff and counterclaim even if the doctrine in *D'Oench, Duhme & Co.*, and 12 U.S.C. § 1823 (e) did not apply. We also note that both the doctrine in *D'Oench, Duhme & Co.*, and 12 U.S.C. § 1823 (e) apply and would bar those claims.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.