**In re George K. BOYER, Debtor.**

**No. 01–32712 (LMW).**

United States Bankruptcy Court,
D. Connecticut.

Oct. 19, 2006.

As Amended Nov. 20, 2006.

Ronald I. Chorches, Esq., Law Offices of Ronald I. Chorches, LLC, Wethersfield, CT, Chapter 7 Trustee.

Douglas M. Evans, Esq., Kroll, McNamara, Evans & Delehanty, LLP, West Hartford, CT, for Republic Credit Corporation I.

Gregory Arcaro, Esq., Brown, Paindiris & Scott, LLP, Glastonbury, CT, for the Debtor.

Patrick W. Boatman, Esq., Law Offices of Patrick W. Boatman, LLC, East Hartford, CT, for Mary C. Boyer.

## MEMORANDUM AND ORDER GRANTING TRUSTEE'S MOTION FOR AUTHORITY TO COMPROMISE CLAIMS

LORRAINE MURPHY WEIL, Bankruptcy Judge.

The matters before the court are (a) that certain Motion for Authority To Compromise Claims (Case Doc. I.D. No. 96, the "Motion To Compromise")[1] filed by the chapter 7 trustee (the "Trustee") and (b) that certain Objection of Republic Credit Corporation I to Trustee's Motion for Authority To Compromise Claims (Case Doc. I.D. No. 96, the "Objection") filed by Republic Credit Corporation I ("Republic"), an unsecured creditor in this case. This court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 105 and/or 363,[2] Rule 9019 of the Federal Rules of Bankruptcy Procedure and that certain Order dated September 21, 1984 of the

---

1. References herein to the docket of this chapter 7 case are in the following form: "Case Doc. I.D. No. ___." References herein to the docket of Adversary Proceeding No. 03-3104 (the "Adversary Proceeding") are in the following form: "A.P. Doc. I.D. No.___."

2. As to the statutory basis for these proceedings, see the court's discussion in *Hicks, Muse & Co., Inc. v. Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 n. 4 (1st Cir.1998).

District Court (Daly, C.J.).[3]

This memorandum constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure (made applicable here by Rule 9014 of those rules).

## I. PROCEDURAL BACKGROUND IN CHAPTER 7 CASE THROUGH JUNE 16, 2005

The above-referenced debtor (the "Debtor") commenced this chapter 7 case by a petition filed on May 24, 2001. (*See* Case Doc. I.D. No. 1.) Ronald I. Chorches was appointed the Trustee the same day. The Debtor's bankruptcy schedules (the "Schedules") disclose the following relevant statements: as of the petition date (a) the Debtor owned real property (a "[b]uilding lot" in East Lyme, Connecticut, the "Building Lot") with a stated value of $25,000.00 (subject to a secured claim in the amount of $7,780.33) (*see* Case Doc. I.D. No. 4 ((Amended) Schedule A—Real Property)); (b) the Debtor owned personal property with a stated value of $8,152.00 (*see* Case Doc. I.D. No. 73 ((Amended) Schedule B—Personal Property));[4] (c) there were undisputed secured claims against the Debtor's property in the amount of $7,780.33 (a real estate tax lien against the Building Lot) (*see* Case Doc. I.D. No. 4 ((Amended) Schedule D—Creditors Holding Secured Claims)); (d) there were undisputed unsecured priority claims against the Debtor in the aggregate amount of $1,442,367.84 (*see* Case Doc. I.D. No. 73 ((Amended) Schedule E—Creditors Holding Unsecured Priority Claims));[5] (e) there were undisputed unsecured nonpriority claims against the Debtor in the aggregate amount of $11,463,287.53 (*see* Case Doc. I.D. No. 73 ((Amended) Schedule F—Creditors Holding Unsecured Nonpriority Claims));[6] (f) the Debtor earned $2,600.00 per month in take-home pay from his occupation (in "Real Estate—Part Time") and social security[7] (*see* Case Doc. I.D. No. 1 (Schedule I—Current Income of Individual Debt-

---

**3.** That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings . . . arising under . . . Title 11, U.S.C . . . . or arising in . . . a case under Title 11, U.S.C. . . . ." References herein to title 11 of the United States Code or to the Bankruptcy Code are references to the same as they appeared prior to the effective date of their amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

**4.** (Amended) Schedule B states that the Debtor had no "[s]tock . . . [or] interests in incorporated and unincorporated businesses." (*See id.,* item 12.)

**5.** Those claims included claims for federal taxes due in the aggregate amount of $1,324,703.44 ($211,408.17 of which is possible tax liability incurred by Boyer Realty Management, Inc.). (*See id.*) The remaining $117,664.40 are taxes due the State of Connecticut. (*See id.*)

**6.** Among those claims are: (a) an undisputed claim held by Republic on a deficiency judgment rendered by the Connecticut Supe-

rior Court in the amount (not including interest and costs) of $7,908,714.42; (b) an undisputed claim held by Republic on a deficiency judgment rendered by the Connecticut Superior Court in the amount (not including interest and costs) of $497,106.21; (c) an undisputed claim of The Cadle Company (Republic's affiliate) on a judgment in the amount (not including interest and costs) of $134,639.80; and (d) an undisputed claim of Standard Sprinkler Corp. ("Standard Sprinkler") on a judgment rendered by the Connecticut Superior Court in the amount (not including interest and costs) of $125,000.00. (*See id.*) Republic holds its judgments as ultimate assignee of the Federal Deposit Insurance Corporation. (*See* Objection at 1–2.)

**7.** The Debtor's SOFA (as hereafter defined) reflects an additional $800.00 per month from a "[r]etirement check from the Coast Guard." (*See* SOFA (as defined below), item 2.)

or(s))); and (g) the Debtor had current monthly expenses of $1,980.00 (*see id.* (Schedule J—Current Expenditures of Individual Debtor(s))).

The Debtor also filed a Statement of Financial Affairs. (*See* Case Doc. I.D. No. 73 ((Amended) Statement of Financial Affairs) (the "SOFA").) Item 1 of the SOFA ("Income from employment or operation of business") states in relevant part as follows:

AMOUNT SOURCE (if more than one)

$14,446.20 2001 YTD 1-1-01 to 5-23-01
 1099 Misc. income ReMax Shoreline $600.00
 1099 Misc. income Birchwood Cheshire Apt. Ltd.
 $10,000.00 W-2 Boyer Realty Management $3846.20

$27,059.68 2000
 1099 Misc. income from ReMax Shoreline $11,675.00
 1099 Misc. income from Birchwood Cheshire Apt. Ltd $10,000.00
 W-2 from Boyer Realty Management $5384.68

$23,900.00 1999
 1099 Misc. income from ReMax Shoreline $11,700.00
 1099 Misc. income from Boyer Realty Management $12,200.00

(*Id.*) Item 4 of the SOFA ("Suits, executions, garnishments and attachments") lists five lawsuits in the Connecticut Superior Court in Norwich in various stages of prosecution. (*See id.*)

The first meeting of creditors and the Trustee's examination of the Debtor under oath required by Bankruptcy Code § 341 was held on June 26, 2001 and November 8, 2001. (*See* Case Docket.) The last date for filing complaints objecting to discharge originally was set for August 27, 2001. (*See* Case Doc. I.D. No. 2.) However, from time to time that date was extended on the separate motions of the Trustee, Republic and Standard Sprinkler. (*See* Case Docket.) Republic appears to have conducted an examination under oath (a "Rule 2004 Examination") of the Debtor pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. (*See* Case Doc. I.D.

No. 21.) Republic also appears to have conducted Rule 2004 Examinations of Kenneth Boyer (the Debtor's son) and Mary Boyer (the Debtor's second and current wife). (*See* Case Doc. I.D. Nos. 61, 62.) On July 18, 2003, Republic filed a complaint objecting to the Debtor's discharge under Bankruptcy Code § 727 which complaint commenced the Adversary Proceeding. (*See* A.P. Doc. I.D. No. 1, the "Complaint.") That was the only such complaint filed in this case. (*See* Case Docket.)

On March 31, 2004, the Trustee filed that certain Application by Trustee To Employ Douglas M. Evans, Esq. and Kroll, McNamara, Evans & Delehanty, LLP as Attorneys for the Trustee. (*See* Case Doc. I.D. No. 81, the "Special Counsel Application"). The Special Counsel Application sought approval of the Trustee's proposed employment of counsel for Republic as special counsel for the Trustee (based upon such counsel's familiarity with this case) on a contingent fee basis for the following purposes:

a. To prosecute a constructive trust claim relating to the transfer of related buildings located at 455 Stonington Road, Stonington, Connecticut and/or to prosecute a constructive trust claim relating to the debtor's alleged transfer of his personal property, including but not limited to, artwork, jewelry, furniture and antiques; and

b. To prosecute a Motion For Turnover of Property of the estate pursuant to 11 U.S.C. Sec. 542 relating to, but not limited to, certain artwork, jewelry, furniture and antiques.

(Case Doc. I.D. No. 81 at 1.) The Special Counsel Application was granted by order dated April 6, 2004. (*See* Case Doc. I.D. No. 82.) "Subsequently, Mr. Evans determined that representing both Republic and the Trustee at the same time created an appearance of a conflict and withdrew as

[special] counsel to the Trustee." (Case Doc. I.D. No. 119 (Republic's brief) at 3 ¶ 6.)

On February 8, 2005, the Trustee filed a report of assets with the Clerk's Office (*see* Case Doc. I.D. No. 94) and the Clerk's Office issued to creditors a Notice of Need To File Proof of Claim Due to Recovery of Assets setting May 9, 2005 as the last date to file proofs of claim in this case. (*See* Case Doc. I.D. No. 95.) Seven proofs of claim were filed before the claims filing deadline. (*See* Case No. 01–32712 Claims Register (the "Claims Register").) Among those proofs of claim are: (a) a proof of claim filed by the Internal Revenue Service asserting (among other claims) an unsecured priority claim (the "IRS Priority Claim") in the amount of $96,710.19 (*see* Claims Register (Claim No. 4)) and (b) a proof of claim filed by Republic asserting a general unsecured claim in the amount of $10,727,946.00 (*see* Claims Register (Claim No. 7)).[8]

The Trustee filed the Motion To Compromise on March 4, 2005. (*See* Case Doc. I.D. No. 96.) The Motion To Compromise covered substantially the same causes of action that were the subject of the Special Counsel Application. (*Compare* Motion To Compromise *with* Special Counsel Application.) Republic filed the Objection on March 21, 2005. (*See* Case Doc. I.D. No. 99.) On April 28, 2005, the Trustee filed that certain Trustee's Notice of Intent To Sell Property at Private Sale and Opportunity To Make Better and Higher Offer with respect to the same causes of action which were the subject of the Motion To Compromise (plus additional fraudulent transfer claim(s)). (*See* Case Doc. I.D. No. 101, the "Sale Notice.") The Debtor, Mary Boyer and Kenneth Boyer (and the Kenneth Boyer Entities (as defined below)) filed objections to the Sale Notice. (*See* Case Doc. I.D. Nos. 103, 106, 108, the "Sale Objections.") The initial hearing (the "Initial Hearing") on the Motion To Compromise, the Objection, the Sale Notice and the Sale Objections was held on June 16, 2005.[9]

## II. THE ADVERSARY PROCEEDING

As noted above, Republic filed the Complaint on July 18, 2003. The Complaint articulates claims for denial of the Debtor's discharge under Bankruptcy Code § 727(a)[10] in four counts. (*See* A.P. Doc.

---

8. In a chapter 7 case for a claim to be allowed an appropriate proof of claim must be filed (even if the claim is scheduled by the debtor). 11 U.S.C. § 502(a). *Cf.* 11 U.S.C. § 1111(a) (different rule for chapter 11 cases). An eighth proof of claim was filed after the deadline by the State of Connecticut, Department of Revenue Services asserting a priority claim in the amount of $12,175.38 and a general unsecured claim in the amount of $132,543.00 (*See* Claims Register (Claim No. 10).) The Claims Register does not list any proofs of claim numbered 3 or 5. (*See* Claims Register.)

9. The oral record of that hearing is referred to herein as follows: "Oral Record at __:__:__."

10. Bankruptcy Code § 727(a) states in relevant part as follows:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition. . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

I.D. No. 1.) The Debtor filed his Amended Answer and Affirmative Defenses on September 29, 2003 contesting certain key elements of the Complaint. (*See* A.P. Doc. I.D. No. 11, the "Amended Answer.") Trial (the "A.P. Trial") on the Complaint began on August 1, 2005 and continued over numerous (nonconsecutive) days to March 21, 2006 when it was completed. (*See* A.P. Docket.) The matter has been taken under advisement subject to post-trial briefing which is not yet complete.

The Complaint alleges in relevant part as follows:

*FIRST COUNT*

1. The Defendant [*i.e.*, the Debtor] is an individual residing at 455 Stonington Road, Stonington, Connecticut.

. . .

5. Mary C. Boyer is an individual residing at 455 Stonington Road, Stonington, Connecticut and has since approximately 1983 been the wife of the Defendant.

6. On or about June 30, 1983, the Defendant purchased, for good and valuable consideration, certain real property located at 455 Stonington Road, Stonington, Connecticut (hereafter the "Stonington Residence").

7. At the time the Defendant purchased the Stonington Residence, he was not married to Mary C. Boyer, and no portion of the purchase price for the Stonington Residence was paid for by Mary C. Boyer.

8. On or about January 8, 1985, the Defendant transferred [the "1984 Transfer"] an undivided one-half interest in the Stonington Residence to Mary C. Boyer for no consideration paid.[11] The Warranty Deed from the Defendant to himself and Mary C. Boyer was recorded in Volume 254 at Page 705 of the Stonington Land Records.

9. Thereafter, on our [sic] about March 7, 1989, the Defendant transferred [the "1989 Real Property Transfer"] his remaining one-half interest in the Stonington Residence to Mary C. Boyer for no consideration paid. The Warranty Deed from the Defendant and Mary C. Boyer to Mary C. Boyer was recorded in Volume 309 at page 591 of the Stonington Land Records.

10. Title to the Stonington Residence is currently in the name of Mary C. Boyer, Trustee.

11. Defendant has continuously resided and continues to reside at the Stonington Residence as his principal residence since 1983, including in the year immediately preceding the filing of the bankruptcy petition herein, and has retained and enjoyed the use and benefit thereof, as well as the use and benefit of any and all income derived therefrom, as if the conveyances to Mary C. Boyer had never been made.

12. On and prior to March 10, 1989, Defendant was the owner of certain furniture, furnishings and other household contents, including but not limited to antiques, collectibles, oriental rugs, artwork, silver, ivory collections and jewel-

---

(4) the debtor knowingly and fraudulently, in or in connection with the case—
 (A) made a false oath or account. . . .
(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. . . .

11 U.S.C.A. § 727 (West 2005).

**11.** The deed to Mary Boyer was executed on May 24, 1984 and recorded in the Stonington land records on January 8, 1985. (*See* Trustee's Exh. 1 (as hereafter defined).)

ry ( [including certain art work by Louis Bonamarte,] hereinafter collectively, the "Personal Property").

13. On or about March 10, 1989, Defendant transferred and conveyed [the "1989 Personal Property Transfer"] all of his right, title and interest in and to the Personal Property to his wife, Mary C. Boyer, for no consideration.

14. Defendant continuously retained and enjoyed the use and benefit of the Personal Property, as well as the use and benefit of any proceeds derived from the sale of any of the Personal Property, after the transfer thereof to Mary C. Boyer, including in the year immediately preceding the filing of the bankruptcy petition herein.

15. For some number of years immediately prior to the filing of Defendant's bankruptcy petition, Kenneth Boyer, who is the Defendants' son, owned and controlled Boyer Realty Management, LLC, Re/Max Shoreline LLC, and one or more other companies that were headquartered in New London, Connecticut (hereinafter the "Kenneth Boyer Entities").

16. For some number of years immediately prior to the filing of his bankruptcy petition, the Defendant was an employee of and/or independent contractor working for one or more of the Kenneth Boyer Entities.

17. For some number of years immediately prior to the filing of the Defendant's bankruptcy petition, the Defendant's wife, Mary C. Boyer, received payments as an employee, independent contractor, or otherwise of one or more of the Kenneth Boyer Entities.

18. Upon information and belief, certain of the payments made to Mary C. Boyer by the Kenneth Boyer Entities as aforesaid constituted compensation for work or services performed by the De-

fendant (hereinafter referred to as the "[Alleged] Redirected Compensation"), which compensation was paid to Mary C. Boyer for the purpose of avoiding the Defendant's creditors.

19. Although the [Alleged] Redirected Compensation was paid to Mary C. Boyer, the Defendant retained and enjoyed and continues to retain and enjoy the use and benefit of the [Alleged] Redirected Compensation, including during the one year immediately preceding the filing of the bankruptcy petition herein.

20. During the one (1) year preceding his Chapter 7 bankruptcy filing on May 24, 2001, the Defendant concealed his interest in property, including but not limited to, the Stonington Residence, the Personal Property, and the [Alleged] Redirected Compensation, with the intent to hinder, delay or defraud creditors.

21. As a result of the foregoing, Defendant's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)(A).

. . .

*THIRD COUNT*

. . .

31. Upon information and belief, during the mid– to late 1980s, the Defendant owned assets valuing in excess of $40 million and had a net worth in excess of $20 million. The assets owned by the Defendant included, but were not limited to, cash, loans receivable, common stock, real estate, partnership interests, insurance policies, automobiles, a sailboat, art, antiques and other items of personal property.

32. For example, on or about February 8, 1988, the Defendant, by and through his accountants, Martin Gottesdiener & Company, prepared and caused to be disseminated a Statement of Fi-

nancial Condition of the Defendant as of November 30, 1987 (hereinafter the "Financial Statement"). The Financial Statement values the total of the assets owned by Defendant as of November 30, 1987 at $40,969,290 and lists the Defendant's net worth at $20,661,088.

33. In his amended bankruptcy schedules filed in connection with this case, Defendant lists the total value of his assets at $33,152.00, with liabilities of $12,905,655.37 [sic].

34. The Defendant has concealed, destroyed, mutilated, falsified and/or failed to keep or preserve any recorded information, including books, documents, records, and/or papers, from which the Defendant's financial condition or business transactions might be ascertained, and specifically, but without limitation, from which an understanding can be achieved of the circumstances resulting in the disappearance of over $40 million in assets.

35. As a result of the foregoing, Defendant's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3).

(Complaint at 1–7.)

The Second Count of the Complaint asserts that the Debtor is not entitled to a discharge under Bankruptcy Code § 727(a)(4)(A) because he failed to reflect his alleged secret interest in the Stonington Residence, the Personal Property and/or the Alleged Redirected Compensation on his Schedules. (*See* Complaint at 5–6.) The Fourth Count of the Complaint asserts that the Debtor is not entitled to a discharge under Bankruptcy Code § 727(a)(5) because he allegedly failed to explain satisfactorily "the circumstances resulting in the disappearance of over $40 million in assets [during the period from the mid-to-late 1980s to the petition date]." (Complaint at 7.)

## III. THE MOTION TO COMPROMISE, THE SALE NOTICE, REPUBLIC'S OFFERS, THE OBJECTION AND THE INITIAL HEARING

As noted above, the Trustee filed the Motion To Compromise. In the Motion To Compromise, the Trustee alleges that

due to certain of the Debtor's acts over the years of maintaining contributions to, and benefitting from the . . . [Stonington Residence] . . . [the Debtor] owned an equitable interest in the . . . [Stonington Residence], with only bare legal title belonging to Mary C. Boyer . . . [and, accordingly, the Trustee] would be able to recover the . . . [Stonington Residence] by virtue of the imposition of a constructive trust.

(*Id.* ¶ 6.) The Trustee further alleges in the Motion To Compromise that

due to certain acts over the years of maintaining the appearance of an ownership interest in the Personal Property, including his use and enjoyment of . . . [the Personal Property] that the Debtor owned an equitable interest in the Personal Property, with only bare legal title belonging to Mary C. Boyer . . . [the Trustee] would be able to recover the Personal Property by virtue of the imposition of a constructive trust . . . [or,][i]n the alternative, discounting the Debtor's handwritten letter purporting to transfer the Personal Property to Mary C. Boyer, . . . the Personal Property, or the proceeds thereof, is subject to a turnover order pursuant to 11 U.S.C. Sec. 542.

(Motion To Compromise ¶ 8.) The Motion To Compromise makes no mention of the Alleged Redirected Compensation.

In the Motion To Compromise, the Trustee seeks authority to settle and release

all ... claims and causes of action [including but not limited to, constructive trust/11 U.S.C. § 542 claims with respect to the Stonington Residence, the Personal Property and the Alleged Redirected Compensation] whether or not known of by the Trustee, and whether or not said claims actually exist, against the following entities [ (collectively, the "Releasees") ]: George K. Boyer, Mary C. Boyer, Kenneth G. Boyer, Mary C. Boyer Living Trust, Stonington Road Realty Trust; the following children of Mary C. Boyer: Laura Guille, Peter Guille, III, and the following companies and entities of Kenneth G. Boyer: Boyer Realty Management, LLC, RE/MAX Shoreline, LLC, New England Design Builders, LLC, Boyer Real Estate, LLC, 300 Bayonet Street, LLC, Westbrook Office Center, LLC, 932 Bank Street, LLC, Southington Meadows, LLC, Stonington Meadows, LLC, 936 Bank Street, LLC, 434 Williams Street, LLC, Hynes Avenue Apartments, LLC, 481 Gold Star Highway, LLC, 571 Gold Star Highway, LLC, and 30 Antonino Road, LLC.

(Case Doc. I.D. No. 96 ¶ 10.) [12] Such proposed settlement (the "Proposed Settlement") is in consideration of an $85,000.00 cash payment from Mary Boyer. (*See id.*) In the Motion To Compromise, the Trustee recommended the Proposed Settlement for the following reasons:

a. The transfers at issue occurred back in 1989 which severely limits the Trustee's causes of actions to bring these assets back into the estate. Though the Trustee believes that constructive trust law is a viable cause of action, the Trustee would have to over-

come numerous and difficult hurdles to meet all the elements of this cause of action and overcome his burden of proof;

b. As to the claims dealing with the Personal Property transfers, even if the Trustee were to prevail, it would be difficult to trace these assets, or the proceeds thereof, due to the fact that these transfers took place approximately sixteen (16) years ago;

c. This litigation is highly contested and it would be expensive and time consuming if these claims were commenced. The Trustee is settling these claims prior to hiring special counsel; [13]

d. This settlement guarantees a dividend to creditors and protects the estate should the Trustee not be able to establish his burden in the litigation of these claims. Due to the large amount of debt owed by the Debtor to the Internal Revenue Service it appears that the Trustee will only be paying administrative and priority creditors in this proceeding.

(Motion To Compromise ¶ 11 (footnote omitted).) The Objection claims that the Proposed Settlement is not fair, equitable and/or reasonable and is not in the best interests of the estate. (*See* Case Doc. I.D. No. 99.)

On or about March 10, 2005, Republic submitted an offer to the Trustee to purchase for $90,000.00 "any and all causes of action relating to any constructive trust and/or fraudulent transfer claims [including, but not limited to such claims relating to the Stonington Residence, the Personal Property and the Alleged Redirected Compensation] that the estate may have against George K. Boyer, Mary Boyer and/or Mary Boyer,

---

12. Laura Guille and Peter Guille, III are the children of Mary Boyer from a previous marriage. (12/19/05 Transcript (as hereafter defined) at 142.)

13. Attorney Evans appears to have withdrawn as special counsel prior to the filing of the Motion To Compromise.

Trustee, Kenneth Boyer, and/or Boyer Real Estate, LLC." On or about March 11, 2005, Republic amended its offer to include the purchase of all [such] claims against all [the] Releasees. Republic's *Exhibit A* [the "Purchase Offer"].

(Case Doc. I.D. No. 119 at 3-4 (Republic's Brief).) [14]

As noted above, the Trustee filed the Sale Notice with respect to the Purchase Offer on April 28, 2005. The Trustee arranged for the Motion To Compromise, the Objection and the Sale Objections to be "scheduled for the same date and time so this matter can hopefully be concluded at that time either by sale or settlement, as the Court may decide." (Republic's Exh. F.) However, at the Initial Hearing the Trustee withdrew the Sale Notice on the record and elected to proceed only on the Motion To Compromise, having come to the conclusion that the Purchase Offer did not pass muster under this court's ruling in *In re Boynewicz*, No. 02–30250, 2002 WL 33951315 (Bankr.D.Conn. Nov.27, 2002), *aff'd*, No. 3:03CV74PCD, 2003 WL 25285649 (D.Conn. April 15, 2003). (*See* Oral Record at 3:51:27–3:57:00.) The hearing (the "Final Hearing") on the Motion To Compromise and the Objection was continued (on an evidentiary basis) to November 14, 2005 when it was commenced. The Final Hearing was concluded on December 19, 2005. (*See* Case Docket.)

In December, 2005,

Republic revised [in writing] its ... [Purchase Offer] to the Trustee. In ... [that revised offer] Republic proposed to pay the Trustee the sum of $90,000.00 if the Trustee abandoned [pursuant to Bankruptcy Code § 554(a) [15]] any and all causes of action against Mary Boyer and third parties [presumably the Releasees], thus allowing creditors of the estate [including Republic] to pursue them. Republic's [Exh.] ... D [the "Abandonment Offer"].

(Case Doc. I.D. No. 119 at 4.) [16] The Trustee has not proceeded on or otherwise acted to accept the Abandonment Offer.

## IV. THE FINAL HEARING

As noted above, the Final Hearing was conducted on November 14, 2005 and December 19, 2005.[17] At the Final Hearing, the Trustee called himself, the Debtor and John O'Neil, Esq. (as an expert witness) as witnesses. Republic did not call any witnesses but cross-examined the Trustee's

---

**14.** Republic's reference above is a reference to an exhibit introduced at the Final Hearing (as hereafter defined). References hereafter to those exhibits appear in the following form: "Trustee's Exh. ___" or "Republic's Exh. ___" (as the case may be).

**15.** Bankruptcy Code § 554 provides in relevant part:

(a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate and that is of inconsequential value and benefit to the estate.

11 U.S.C.A. § 554(a) (West 2005).

**16.** The Abandonment Offer also included an offer by Republic "to contribute [to the estate] 10% of any recovery in excess of the $90,000 paid to the estate and legal expenses incurred [ (the "Proposed Contribution") ]." (Republic's Exh. D.)

**17.** Transcripts of those proceedings are in the record as Case Doc. I.D. No. 129 (the December 19, 2005 hearing) and Case Doc. I.D. No. 130 (the November 14, 2005 hearing). References herein to the record of the November 14, 2005 proceedings are in the following form: "11/14/05 Transcript at ___." References herein to the record of the December 19, 2005 proceedings are in the following form: "12/19/05 Transcript at ___." The court notes that the transcripts bear captions which refer to the Adversary Proceeding. Those captions are incorrect as the subject transcripts pertain to proceedings in the bankruptcy case, not the adversary proceeding.

witnesses. Mary Boyer also "cross-examined" those witnesses (on a friendly basis). Both Republic and the Trustee introduced documentary evidence into the record. At the conclusion of the Final Hearing, the court took the matter under advisement, subject to post-trial briefing. Post-trial briefing now is complete and the matter is ripe for decision. References to the record of the Final Hearing will be made as appropriate in the discussion below.[18]

## V. THE RECORD OF THE FINAL HEARING

### A. The Debtor's Testimony [19]

At the Final Hearing, the Debtor testified in relevant part as follows. The Debtor purchased the Stonington Residence in May or June of 1983. He was not married at the time and took title solely in his own name and held title in that fashion until the 1984 Transfer. (11/14/05 Transcript at 5–6.) He made the 1984 Transfer because (among other reasons)

[i]n 1984 I [became] ... married [to Mary Boyer] and renovations were starting on the house. [Mary Boyer] was willingly transferring money from her account to our account and using that money to improve the property.... And then again I felt, as I have in the past, I wanted to share whatever I had with my new wife.

(Id. at 9:24–10:4 (testimony of the Debtor).) The 1989 Real Property Transfer was for the same reason. (Id. at 10.) With respect to the 1989 Personal Property Transfer, that

convey[ed] to my wife ... the furniture, the furnishings and other household contents within ... [the Stonington Residence]. Ninety-five percent, if not more, was ... [Mary Boyer's] originally because when we married I had absolutely nothing. I was living in a furnished apartment [after a divorce]. And all those furnishings that were in ... [the Stonington Residence] ... came from the sale of ... [Mary Boyer's] house after our marriage.

(11/14/05 Transcript at 11:1–7 (testimony of the Debtor).)

The Debtor further testified in relevant part as follows. He would not now be able to identify the relevant items of personal property because the transfer "was too far back in my memory" (id. at 11:16 (testimony of the Debtor)). Moreover, "[t]here have been several renovations to the house and furniture that was originally brought into the house was sold, and with those proceeds ... [Mary Boyer] purchased furniture more contemporary to the house" (id. at 11:21–24 (testimony of the Debtor)). The Debtor was neither being sued nor threatened with suit at the time of any of the subject transfers, nor did he anticipate at those times that he was going to have financial problems. (Id. at 11:8–9.)[20]

18. The facts found throughout this opinion have been taken from the record made at the Final Hearing and from the entire record of this chapter 7 case. Except to a very limited extent (and for the reasons discussed below), the court does not rely upon, or refer to, the record in the Adversary Proceeding.

19. The court does not find the following as facts but merely notes the fact of the testimony itself.

20. Republic's Exhibit B is an unaudited financial statement (the "1987 F/S") in respect of

the Debtor as of November 30, 1987 compiled by certified public accountants. Republic's Exhibit C appears to be an unaudited financial statement (the "Original 1989 F/S") of the Debtor as of April 30, 1989. The Original 1989 F/S was submitted to The Connecticut Bank and Trust Company, N.A. under cover of an October 6, 1989 letter from the Debtor. That financial statement (the "Modified 1989 F/S") bears hand written notations adjusting the Debtor's net worth downward to some degree. (See Republic's Exh. C.) The 1987 F/S, the Original 1989 F/S and the Modified

That was because at those times "[t]he economy was still strong and moving forward" (*id.* at 9:19–20 (testimony of the Debtor)). However, there were at least some lawsuits against him as early as 1990 and perhaps some foreclosure actions instituted at about the same time. (*Id.* at 24–26.)[21] The Original 1989 F/S showed total assets of about $31.9 million and total liabilities of about $16.4 million. (11/14/05 Transcript at 17.) (*See also* Republic's Exh. C.) A large part of those liabilities was mortgage debt. (*Id.*) At the time that the Original 1989 F/S was prepared, the Debtor believed that such financial statement was true and that he had positive net worth. (11/14/05 Transcript at 17–19.)

## B. *The Trustee's Testimony* [22]

At the Final Hearing, the Trustee testified in relevant part as follows. The Trustee thought that he had a viable cause of action for constructive trust when he filed the Motion To Compromise. (12/19/05 Transcript at 112.) However, he changed his mind when he went "back and reread the earlier transcripts, and I . . . did it in a light as if I were going to try the case" (*id.* at 113:5–6 (testimony of the Trustee)). In

reaching his ultimate determination the Trustee reviewed the two examinations of the Debtor under oath which the Trustee took, numerous relevant transcripts including state court deposition transcripts, the transcript of a Rule 2004 examination taken by Republic and the transcripts of the A.P. Trial (including the testimony of Louis Bonamarte).[23] (12/19/05 Transcript at 91–92, 113, 124, 155, 158.) The Trustee also reviewed the pleadings in the Adversary Proceeding and conversations he had had with the Boyers, their counsel and Attorney Evans (Republic's counsel). (*Id.* at 124, 155, 158.) The Trustee also had attended several hours of Republic's examinations of Mr. and Mrs. Boyer under oath. (*Id.* at 124.) The Trustee is familiar with "constructive [trust] law in Connecticut, having litigated those issues for other trustees . . ." (*id.* at 93:2–3 (testimony of the Trustee)).[24]

The Trustee testified further in relevant part as follows.

I am before the court today looking to compromise those claims for several reasons. And just to simplify it, before I get into detail, the main reason is be-

1989 F/S disclose that the Debtor's apparent wealth was primarily derived (either directly or indirectly) from real estate investments, as was the bulk of his liabilities. (*See* Republic's Exhs. B and C.)

21. Item 4 of the SOFA (listing "[s]uits, executions, garnishments and attachments" pending as of the petition date) lists one "[d]ebt [c]ollection" action with a 1988 case number. (*See* Case Doc. I.D. No. 73 (SOFA, item 4) (*Paul Smith et al v. George K. Boyer* d/b/a *et al*, CV88–0090446).) That action was there described as being in "[p]ost [j]udgment enforcement proceedings." (*See id.*) Paul and Paula Smith are listed on the Debtor's (Amended) Schedule F as "[j]udgment [c]reditors" in the amount of $5,000.00. (*See* Case Doc. I.D. No. 73 (Amended Schedule F).) The court attaches little significance to this one small judgment.

22. The court credits the Trustee's statements of what he did, his opinion and his basis for that opinion as true and accurate. Attorney O'Neil testified prior to the Trustee but, for analytical reasons, Attorney O'Neil's testimony is discussed below.

23. Mr. Bonamarte is an artist and was a protégé of sorts of the Debtor. Mr. Bonamarte testified at the Trial with respect to the ownership and value of certain of his works in the possession of one or more of the Releasees.

24. The Trustee has been in practice since 1991 and has been on the United States Trustee's Panel of Standing Trustees for this district since May 19, 1997.

cause when all is said and done I don't believe that myself as a Trustee, or any other party in interest would be able to prevail in those claims, either before this court, a state court or any other court of competent jurisdiction.

In other words, to put it, I guess, bluntly is I really ... don't believe at the end of the day that I would be able to prevail on those claims.

And having spent over the last several weeks and months additional time looking at those claims, ... I wouldn't feel comfortable myself as an attorney bringing those claims, and I wouldn't feel comfortable hiring another attorney to prosecute those claims on behalf of the estate.

The main problems I see is that we're talking about transfers that happened back in 1984 and 1989. The major transfer that I'm looking at is back in 1984. That was a transfer of a half interest of real estate, which the debtor still resides in today. And certainly at that time I have not seen any evidence that the debtor was in any type of financial difficulties. I see no evidence that the debtor was insolvent. I see ... evidence quite to the contrary that he was a very solvent individual. Was making a large amount of money. Had the ability to make a large amount of money. . . .

. . .

[T]he basis of constructive trust law is that there has to be some type of—it's [sic] an equitable remedy, therefore something unconscionable, inequitable must have happened at that time. I look at the transfer of that piece of property and I see no evidence of that.

And looking at that particular transfer, I don't know how I could make an argument saying that Mr. Boyer has—

has equitable title to that property, and Mrs. Boyer has—I guess the argument would be bare legal title.

The second transfer took place ... in 1989. And even as late as 1989 from the documents I've reviewed I haven't seen any real evidence that—I know there's been allegations made, but I haven't seen it through the documents that I've reviewed, that Mr. Boyer was in severe financial difficulty at that time, or—or knew that he would be in severe financial difficulty in the near future.

[W]hat was transferred in 1989 was another half interest of the residence. . . .

. . .

Secondly, what was transferred back in 1989 was personal property. . . .

And certainly going back 15 years, maybe a little less prior to the filing of the petition, but going back that far, the Trustee would have difficulties in identifying a property or really the proceeds of those [personal] properties, and that's one item that I took into consideration. . . .

The decisions that I've read that speak about constructive trusts, and speaking to other attorneys who I know in the State of Connecticut who have litigated constructive trust cases, and a lot of cases have—have settled these matters there's kind of been what I call a red flag. In other words, the—the debtor, or individuals in those cases, would hold—the problem we have with constructive trust cases is when we're dealing with real estate is that a transfer of real estate is recorded on the land records for the whole world to see. So, the movant has to have some type of evidence really overcoming that. And the cases that I have seen deal with—

there's been documentation, such as financial statements where the particular debtors have—even though they have transferred the property, have held out to the public, or certain individuals, creditors, and entities, that they own that piece of property. Or that there are—they claim some type of deduction on their personal—on just their personal income taxes. Some type of documentation, some type of large red flag that you can say, hey, you transferred the property, but you're showing something different here, and I don't see that in this particular case.

And again, constructive law is an equitable remedy, and with lack of—with lack of wrongdoing at the time of the transfer with not having these red flags—I mean, certainly you can't—I mean, you can make an argument in any case that property was transferred, that the individuals were still living in the property. They—or they're still using the property. That they're contributing to the property, but that's an argument that can be made in any particular case. . . .

. . .

And I certainly believe that this settlement falls above the lowest, and I would assert, far above the lowest realm of reasonableness, which different courts have interpreted in deciding whether various settlements are reasonable.

(12/19/05 Transcript at 94:1–101:19 (testimony of the Trustee).)

The Trustee further testified in relevant part as follows. At the time he filed the Motion To Compromise he was unaware of Republic's contentions in respect of the Alleged Redirected Compensation. (12/19/05 Transcript at 153.) However, he became aware of those contentions after reading the record of the Adversary Proceeding. (*Id.*) After reviewing the record of the Adversary Proceeding, the Trustee concluded that the subject compensation had not been diverted from the Debtor.

[T]here are two separate aspects that I looked at. One of them is that Mr. Boyer was an agent. Has been an agent for 30/40 years in that area, and had encountered a lot of good will. Got a lot of referrals for listings of property and sales of property, and he worked in a group. And the testimony that he gave was that he is—his health was extremely poor and he had the ability—while he might have had the ability to bring the work in, to get the referrals, to get the listings, he didn't have the ability to show the house because of his health. Didn't have the ability to show these houses, didn't have the ability to—on a particular Sunday to stay all day and have an open house and to do all the running that an agent traditionally does. And he had a particular group of I think four people, and he shared his commissions with those people. And he provided me very detailed charts over a period of about three years, showing the income that was brought in and the amount of money that he received. And it made—it made sense to me. His testimony based—these documents I don't have with me today, but they were very detailed graphs and charts of all the money that he had brought in through this Remax Company [an entity controlled by Kenneth Boyer], and all the listings he has had over a number of years. . . .

(12/19/05 Transcript at 150:15–151:12 (testimony of the Trustee).) Even if the Trustee had been aware of Republic's contentions in respect of the Alleged Redirected Compensation, he still would have accepted the Proposed Settlement because "[t]he dollar amount that I had in my head was

far less than ... what is on the table today. And I still think that ... it's a fair and reasonable settlement, even going back and reading those transcripts prior to testifying here today" (*id.* at 154:8–12 (testimony of the Trustee)).

The Trustee further testified in relevant part as follows. The list of the Releasees originated with Mary Boyer's counsel. (12/19/05 Transcript at 126–27.). The Trustee did not try to negotiate for a smaller list of Releasees. (*Id.* at 143–44.) He accepted Mary Boyer's counsel's representation that most of the limited liability company Releasees were entities related to Kenneth Boyer. (*Id.* at 141–42.) He inferred that the Boyers wanted as a complete release as possible to obtain a global peace (except for the Adversary Proceeding) against Republic. (*Id.* at 128–29.) The Trustee further testified that he was comfortable about giving general releases to all the Releasees because

> "my analysis was whether or not I had claims against those entities. And I certainly, to my knowledge, had no claims against those entities.... [T]he estate has been active for going on five ... years now. If I had any claims against ... [the Releasees] I would certainly hope that I would know about it. And I don't know that I have any claims against those entities."

(*Id.* at 143:8–144:12 (testimony of the Trustee).)

### C. *Attorney O'Neil's Testimony*[25]

Attorney O'Neil was admitted to practice in 1968 and has been a trustee in some capacity (even before he passed the bar) for thirty-nine years. (11/14/05 Transcript

at 28.) Attorney O'Neil testified in relevant part as follows. He is familiar with the doctrine of constructive trust both in Connecticut and elsewhere. (*Id.* at 28.) The Trustee met with Attorney O'Neil at his office to talk about the Proposed Settlement in addition to talking to Attorney O'Neil several times on the telephone. (11/14/05 Transcript at 45.) When the Trustee visited Attorney O'Neil's office, the Trustee brought several bulky files which contained numerous deposition transcripts of Mr. and Mrs. Boyer. (*Id.* at 46.) They went over "highlights" of those transcripts together. (*Id.*) Attorney O'Neil believes himself familiar with the facts and circumstances surrounding the alleged causes of action. (*Id.* at 28.) In addition to the time spent reviewing the facts of this case, the Trustee and Attorney O'Neil spent at least an hour reviewing different cases that interpreted constructive trust law in Connecticut and elsewhere. (*Id.* at 46.) The Trustee also went over his own view of the case with Attorney O'Neil. (*Id.* at 46–47.) The Trustee told Attorney O'Neil about the Trustee's "difficulties in that besides Attorney Evans finding another attorney to litigate these claims on behalf of the estate" and that the Trustee had "spent considerable time speaking to various attorneys, including counsel who [had] ... a number of published decisions in the State of Connecticut." (11/14/05 Transcript at 49:1–11 (interchange between the Trustee and Attorney O'Neil).)

Attorney O'Neil further testified in relevant part as follows. In response to the Trustee's question whether the Trustee or any trustee could make an argument that

---

**25.** Attorney O'Neil testified as an expert witness for the Trustee on the value of the constructive trust/Section 542 causes of action (except with respect to the Alleged Redirected Compensation). Attorney O'Neil was paid for his time; that payment was funded by the

Boyers. (11/14/05 Transcript at 70.) The court credits Attorney O'Neil's testimony concerning what he did (including the conversations he had), his opinion and the basis therefor.

the Debtor had an equitable interest in the Stonington Residence and/or the Personal Property, Attorney O'Neil answered in relevant part:

> [A]nybody can make an argument about anything, [sic] it's a question of whether you win. And I think ... that's a very difficult road you've got to hoe there.... I would say in your situation you've got a long period of time. You've got a very difficult proof situation, and it's illustrative of the fact that I do know [the Trustee told him] that you attempted to find counsel to take this on a contingent fee basis. And I find ..., that's my litmus test, if you get three or four guys who have been doing this for some time and tell you they just as soon not bother, they're telling you something. And I think ... you have to listen.

(11/14/05 Transcript at 42:20–43:8 (testimony of the Attorney O'Neil).) Attorney O'Neil concluded that the Trustee's case against the Boyers "was not [a] particularly ... great case." (*Id.* at 64:13–14.) That there were no lawsuits pending against the Debtor in 1989 (the Trustee told Attorney O'Neil) was a significant factor in Attorney O'Neil's opinion. (*Id.* at 66.) Attorney O'Neil also had concerns about tracing the Personal Property after sixteen years. (*Id.* at 43.) He did not know about the Alleged Redirected Compensation and his opinion did not apply to that alleged claim. (*Id.* at 60–61.) Attorney O'Neil also had no opinion as to the propriety of the list of Releasees. (*Id.* at 69–70.)

## VI. ANALYSIS

### A. Standards

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." F.R. Bankr.P. 9019(a). The bankruptcy court "may only approve a proposed settlement after an independent determination that it does not 'fall below the lowest point in the range of reasonableness'." *Nisselson v. Carroll (In re Altman)*, 302 B.R. 424, 425 (Bankr.D.Conn.2003) (Shiff, J.), *citing In re Best Prods. Co.*, 177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir.1995). "[T]he responsibility of the bankruptcy judge ... is not to decide the numerous questions of law and fact raised by ... [the objector] but rather to canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *Anaconda—Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 762 F.2d 185, 189 (2d Cir.1985) (internal quotation marks omitted). The burden of persuasion is on the trustee putting forth the proposed settlement. *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1381 (9th Cir.), *cert denied.*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986).

The bankruptcy judge should not simply " 'rubber stamp' the trustee's proposal." *Depoister v. Mary M. Holloway Found. (In re Depoister)*, 36 F.3d 582, 587 (7th Cir.1994). However, "[t]he [bankruptcy] judge ... is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference." *Healthco Int'l*, 136 F.3d at 50 n. 5 (internal quotation marks omitted) (alterations in original). "[C]ourts need not conduct an independent investigation in formulating an opinion as to the reasonableness of a settlement; rather, they may give weight to the trustee's informed judgment that a compromise is fair and equitable and to the competency and experience of counsel who support the settlement." *In re Altman*, 302 B.R. at 425–26

## B. *Relevance of the Adversary Proceeding*

The Motion To Compromise does not seek to settle the discharge proceeding (*i.e.*, the Adversary Proceeding), and the parties are in accord that the Proposed Settlement would not bar that proceeding. (*See* 12/19/05 Transcript at 116–18.) That does not mean that the Motion To Compromise is financially irrelevant to the Adversary Proceeding. Assuming (for the purposes of argument only) that the Debtor is denied his discharge, Republic would be free to pursue the Debtor on its assigned judgment claims. However, given the Debtor's minimal current property interests (and his exemption of the same, *see* Case Doc. I.D. No. 4 (Schedule C—Property Claimed as Exempt)), if the Stonington Residence, the Personal Property and the Alleged Redirected Compensation are "taken off the table" by approval of the Proposed Settlement and execution and delivery of appropriate forms of releases to the Releasees, the Debtor (who is about seventy-five years old and hearing impaired) probably would be judgment proof and might remain so. Thus, there is a risk that any victory by Republic in the Adversary Proceeding might be rendered financially meaningless by this court's approval of the Proposed Settlement. In reaching its decision here, the court is sensitive to Republic's concern in that regard.

■ As is apparent from a review of the Complaint, there would be at least some overlap of evidence between the evidence used to prove (and defend against) the alleged constructive trust/Section 542 claim with respect to the Stonington Residence, the Personal Property and the Alleged Redirected Compensation (*i.e.*, that Mary Boyer holds bare legal title to the

foregoing property) and the evidence used to prove (and defend against) the First Count and the Second Count of the Complaint. It has been suggested by Republic that the court defer its decision here until it renders a decision in the Adversary Proceeding. For the reasons discussed below, the court will not so defer its decision.

The purpose of a settlement is twofold: first, to eliminate further litigation expense for the parties; and second, to eliminate (or at least monetize) litigation risk. The Trustee is not a party to the Adversary Proceeding, so expense incurred there is not his concern. However, there is at least some possibility that the court might resolve the Adversary Proceeding in such a way that Republic's constructive trust theory would be functionally (although perhaps not technically) precluded. If that were to happen, the Proposed Settlement might not seem as desirable to Mary Boyer and she might seek to withdraw from it. Thus, to defer decision would expose the Trustee to litigation risk and might strip him of the benefit of the certainty (and recovery) he would obtain from the Proposed Settlement. That the court declines to do. For the same reason, except for reference to the Complaint and the Amended Answer and the fact of Louis Bonamarte's testimony at the A.P. Trial, this court will not now itself refer to the record of the Adversary Proceeding.[26] However, as demonstrated above, the Trustee has reviewed that record.

## C. *Relevance of Bankruptcy Code § 546(a)*

■ In this case the limitations period for the Trustee to exercise his statutory

---

26. Any statement(s) herein which might be construed as statement(s) of this court's opinion of the value of the claims to be released is for the limited purposes of these proceedings only and will not be binding in the Adversary Proceeding.

avoidance powers expired two years after the petition date. *See* 11 U.S.C. § 546(a). The parties are in agreement that the Trustee's power to avoid fraudulent transfers (if any) to the Releasees has, accordingly, expired. As a result, the Trustee lacks standing to settle any such causes of action. *Cf. Barber v. Westbay (In re Integrated Agri, Inc.)*, 313 B.R. 419, 427–28 (Bankr.C.D.Ill.2004) (trustee loses standing to prosecute such causes of action after expiration of Section 546 limitations period). *See also In re Balonze*, 336 B.R. 160, 171 n. 23 (Bankr.D.Conn.2006) (trustee cannot settle cause of action which he does not own).[27]

The parties also agree that Section 546(a) does not apply to the constructive trust/Section 542(a) theory. *See* 11 U.S.C. § 542(a).[28] Accordingly, the court will proceed on the basis that the Trustee has standing to settle the alleged constructive trust/Section 542(a) claims (if any).

### D. *The Merits of the Proposed Settlement*

#### 1. *Constructive Trust Theory*

■■ Republic argues that the Stonington Residence, the Personal Property and the Alleged Redirected Compensation are subject to a constructive trust in favor of the Debtor's creditors under applicable Connecticut law.[29] The Connecticut courts articulate the equitable remedy of constructive trust as follows:

"A constructive trust arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.... A constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form ... [or] when a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." (Internal quotation marks omitted.) *Jaser v. Fischer*, 65 Conn.App. 349, 359, 783 A.2d 28 (2001); *see also Wendell Corp. Trustee v. Thurston*, 239 Conn. 109, 113, 680 A.2d 1314 (1996)....

. . .

It is true that in the more usual case, "where a constructive trust is imposed

---

27. The standing issue might have been resolved differently if the Trustee were arguing (which he is not) that the doctrines of waiver, estoppel or equitable tolling permitted him to bring fraudulent transfer causes of action notwithstanding the technical running of the Section 546 limitations period. *Cf. Pryor v. Rodriguez (In re Rodriguez)*, 283 B.R. 112 (Bankr.E.D.N.Y.2001) (Section 546(a) is a true limitations period and not a statute of repose). *See also IBT Int'l, Inc. v. Northern (In re International Admin. Servs., Inc.)*, 408 F.3d 689, 699 (11th Cir.2005) ("[Bankruptcy Code] § 546 is ... a statute of limitations, subject to waiver, equitable tolling, and equitable estoppel.").

28. Section 542 provides in relevant part:

[A]n entity ... in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C.A. § 542(a) (West 2005).

29. It has not been suggested that any other law applies.

the result is to restore to the plaintiff property of which he has been unjustly deprived and to take from the defendant property the retention of which by him would result in a corresponding unjust enrichment of the defendant; in other words the effect is to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in the position in which he was before the defendant acquired the property." Restatement (First), Restitution, Constructive Trust § 160, comment (d), p. 643 (1937).

"There are some situations, however, in which a constructive trust is imposed in favor of a plaintiff who has not suffered a loss or who has not suffered a loss as great as the benefit received by the defendant. In these situations the defendant is compelled to surrender the benefit on the ground that he would be unjustly enriched if he were permitted to retain it, even though that enrichment is not at the expense or wholly at the expense of the plaintiff." *Id.*, at pp. 643–44....

*Cadle Co. v. Gabel*, 69 Conn.App. 279, 288–89, 794 A.2d 1029 (2002) (last two alterations added).[30] It is unclear whether, in a non-fiduciary or non-confidential relationship situation, the Connecticut courts require that a constructive trust be proved by clear and convincing evidence or whether proof by a preponderance of the evidence is sufficient. *See Cadle Co. v. Jones*, No. 3:00CV316WWE, 2004 WL 2049321, at * 10 (D.Conn. Aug.20, 2004) (discussing Connecticut law on the burden of proof for a constructive trust).

### 2. The Court's Evaluation of the Record of the Final Hearing

The Trustee has appeared before this court on many occasions over a more than seven-year period and the court considers him to be an experienced, competent trustee. As demonstrated above, the Trustee believes that the estate was fortunate to obtain the Proposed Settlement. Based upon the record here (including the portions set forth above), the court is persuaded that the Trustee's decision to go forward with the Proposed Settlement represents an "informed judgment," *Altman*, 302 B.R. at 426, by the Trustee.

The Trustee obviously credits the Debtor's versions of the 1984 Transfer, the 1989 Real Property Transfer and the 1989 Personal Property Transfer as well as the Debtor's explanation in respect of the Alleged Redirected Compensation. The Trustee has had numerous opportunities during the more than five-year lifespan of this case to form an opinion of this Debtor's credibility and the court accords due deference to the good opinion of the Debtor's credibility which the Trustee has formed.

The Trustee accepted the full list of Releasees (in addition to the Debtor, Mary Boyer, and Kenneth Boyer) and is willing to give essentially general releases to them, because (1) after five years, the Trustee had no reason to believe that the estate had a claim against any of those additional Releasees *(see* 12/19/05 Transcript at 143–44) and (2) because he assumed that the Boyers were looking to obtain a global peace (other than with

---

**30.** In *Gabel,* the Appellate Court held that the following showing satisfied "probable cause" for the finding of a constructive trust for a valid lis pendens: evidence that the defendant husband (a) arranged for a confidant to become his secured creditor by purchasing at a substantial discount the note and mortgage being foreclosed on the family home in which there was no equity, and (b) then had that confidant complete foreclosure and transfer title to the house (which originally had been solely in the husband's name) to the defendant wife. *Gabel,* 69 Conn.App. at 287–93, 794 A.2d 1029.

respect to the Adversary Proceeding) against a dogged adversary (*i.e.*, Republic) (*see id.* at 128–29). Given the Trustee's greater familiarity with those matters (including the history between Republic and the Boyers), the court will not substitute its judgment for his with respect to such matters.

Finally, although the Trustee's testimony is a sufficient basis for the court's conclusion, Attorney O'Neil's low opinion of the value of the alleged claims against Mary Boyer with respect to the Stonington Residence and the Personal Property is additional support for this court's conclusion that the Proposed Settlement is reasonable.

Based upon all of the foregoing, the court concludes that the Proposed Settlement "does not fall below the lowest point in the range of reasonableness," *Altman,* 302 B.R. at 425.[31]

### E. *The Trustee's Alternatives*

The Trustee has three putative alternatives to the Proposed Settlement: the Pur-

chase Offer; the Abandonment Offer; and closing the chapter 7 case as a "no asset" case.[32]

### 1. *The Purchase Offer*

■ Republic argues that the Trustee has the alternative of accepting the Purchase Offer. As discussed above, pursuant to the Purchase Offer the Trustee would assign his alleged claims against the Releasees to Republic.

> Because th[e] ... grant of authority to bring avoidance actions under the various sections of the Bankruptcy Code is specific to the trustee ... cases entertaining a request for a "transfer" of such right are rare, and are rarely granted. ...

*In re Metropolitan Elec. Mfg. Co.,* 295 B.R. 7, 12 (Bankr.E.D.N.Y.2003).[33] *Cf. In re Boynewicz, supra* (denying trustee's motion to sell cause(s) of action for avoidance and the like). In this case, the Trustee states that he does not "believe" in the constructive trust claim and that he believes that no one could prevail on that

---

**31.** Republic argues that the alleged claims must be very valuable or else Mary Boyer would not be willing to pay $85,000.00 for release of them. In *Balonze,* this court rejected a substantially similar argument:

> The Debtor argues that the Federal Action must be very valuable if Town Fair is willing to pay more than $56,000 for the Trustee's release of it.... [B]ased on this record the court finds that it is more likely that it is the Debtor's evident desire to litigate with Town Fair until the end of time if possible, rather than the perceived merits of the Federal Action, which has produced the subject settlement.

*Balonze,* 336 B.R. at 171 n. 25.

**32.** There was another option at least theoretically available to Republic. That was for Republic to seek court authorization to prosecute the alleged causes of action *on behalf of the estate. See In re Housecraft Indus. USA, Inc.,* 310 F.3d 64, 71 n. 7 (2d Cir.2002) (dis-

cussing availability of remedy). If Republic had done that, it would have been required to prove, *inter alia,* that the Trustee had unjustifiably refused to bring suit on the alleged causes of action. *See Unsecured Creditors Committee of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.),* 779 F.2d 901 (2d Cir.1985). Republic did not elect to pursue that remedy.

**33.** That is because " '[a]ssignments of the Trustee's unique statutory powers, if not narrowly circumscribed, may too easily result in the delegation and dilution of the trustee's duty to marshal the debtor's property for the recovery of all ... [creditors].' " *Metropolitan Electric,* 295 B.R. at 12 (quoting *In re Greenberg,* 266 B.R. 45 (Bankr.E.D.N.Y.2001) (internal quotation marks omitted)). The alleged constructive trust/Section 542 claims are not technically avoidance claims. However, they are sufficiently analogous to avoidance claims such that the same rules should (and do) apply to assignments of both.

claim (including in a non-bankruptcy forum). (12/19/05 Transcript at 101; *id.* at 94, 129.) In denying sale approval in a materially similar situation, the court in *Metropolitan Electric* stated:

> In the case before the Court, the proposal to permit Joseph Shelley to maintain fraudulent conveyance actions against third parties, which claims the Trustee admits have little or no value, without the Trustee's supervision and participation, does not pass muster. This Court is bound under Second Circuit law to only approve the sale of these claims if 1) the Trustee consents and 2) the court finds that the suits would be a) in the best interest of the bankruptcy estate and b) necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. The Court notes that the Trustee has consented to the sale of the Claims, but the Trustee denies that the proposed avoidance actions have sufficient merit to warrant their commencement and declines to participate with the offeror in any action taken by him. Therefore the Trustee's consent is deemed to be half-hearted at best.... There is no "blessing" by the Trustee regarding the Claims, nor is this situation akin to the *Housecraft* case *[Housecraft Industries,* 310 F.3d 64] where the trustee had insufficient funds to commence colorable claims against certain parties holding property which belonged to the estate.

*Metropolitan Electric,* 295 B.R. at 13. This court adopts the reasoning in *Metropolitan Electric* and it produces the same result here. Moreover, the court notes that permitting a trustee to sell causes of action which he would not litigate himself under any circumstances would encourage trustees to traffic in causes of action with no litigation value. That would foment useless litigation and is against public policy.

For the foregoing reasons, the court concludes that the Purchase Offer would not be an option available to the Trustee.

### 2. *The Abandonment Offer*

 Republic also argues that the Trustee has the alternative of accepting the Abandonment Offer. As discussed above, the Abandonment Offer proposes that the Trustee "abandon" the constructive trust/Section 542 causes of action pursuant to Bankruptcy Code § 554(a) for a cash payment of $90,000.00. There would seem to be a conceptual inconsistency between abandoning the constructive trust/Section 542 causes of action as either "burdensome to the estate or ... of inconsequential value and benefit to the estate," 11 U.S.C.A. § 554(a) (West 2005), in exchange for a $90,000.00 cash payment. However, it is not necessary for the court to hold that a trustee can never, under any circumstances, abandon property for consideration in order to rule here. That is because the Trustee has before him an $ 85,000.00 offer for the subject property and that amount is sufficient to pay a substantial dividend on the IRS Priority Claim. Accordingly, it cannot be said that the constructive trust causes of action are either "burdensome" or of "inconsequential value and benefit to the estate." Thus, an abandonment cannot be approved.[34]

For the reasons discussed above, the court concludes that the Abandonment Offer would not be an option available to the Trustee.

---

34. Because the court has determined that the Abandonment Offer would not be an appropriate option, it is not necessary for the court to consider issues in respect of the Proposed Contribution.

### 3. *No Asset Case*

If the Motion To Compromise is not granted, the Trustee will have to close the case as a "no asset case." Even if the Trustee did believe in the constructive trust/Section 542 causes of action (which he does not), the Trustee has no funds to pay counsel to prosecute them (12/19/05 Transcript at 147: 20–21 ("[T]here's no other assets that are out there.") (testimony of the Trustee)) and has had difficulties in obtaining counsel (other than counsel for Republic who withdrew) to prosecute those alleged causes of action on a contingent fee basis (*see* 11/14/05 Transcript at 49:1–6 (interchange between the Trustee and Attorney O'Neil)).[35] Thus, if the Motion To Compromise is denied, there will be no distribution on the IRS Priority Claim (as opposed to the substantial distribution which would occur under the Proposed Settlement). Republic holds the largest claim by far in this case, but that does not give Republic the right to withhold the distribution on the IRS Priority Claim which is a claim senior in priority to Republic's general unsecured claim. *See* 11 U.S.C. §§ 507(a) and 726(a) (chapter 7 statutory priority scheme). Moreover, even if closing this case would revest the constructive trust claims in the Debtor's creditors (a point on which the court takes no position in this case),[36] the court defers to the Trustee's informed judgment that those creditors would not be getting anything meaningful by that abandonment (*i.e.,* no creditor could prevail on those claims).

For the reasons discussed above, the court concludes that, under these circum-stances, the "no asset" case option is not an appropriate option for the Trustee.

### F. *Mary Boyer's Motives*

Republic argues that Mary Boyer seeks to settle with the Trustee not to obtain protection from the Trustee (who has no intention of pursuing her and/or related parties) but, rather, to obtain protection against Republic who (either by itself or through its predecessors in interest) has been pursuing the Debtor for about sixteen years. *See, e.g., F.D.I.C. v. Napert–Boyer P'ship*, 40 Conn.App. 434, 671 A.2d 1303 (1996). Doubtless that is true: a settlement by the Trustee of the alleged constructive trust causes of action would bar Republic (or any other creditor) from proceeding upon them. *Cf. In re Tessmer*, 329 B.R. 776, 780 (Bankr.M.D.Ga.2005) ("Once the Trustee acts under § 544(b), the rights of all other parties to bring a suit based on the same transaction are fully and permanently cut off unless the Trustee later abandons his claim."). Moreover, at first blush, it might seem anomalous for the court to permit the Trustee to settle a cause of action in which he does not "believe" when the court will not permit the Trustee to sell that cause of action. However, neither of the foregoing necessarily means that the Proposed Settlement should be disapproved.

In *Balonze, supra,* this court approved a settlement when the non-trustee settling party was motivated solely by its desire to obtain protection from a dogged pursuer (in that case, the debtor herself). The court approved that settlement because the court accepted the trustee's assertion that the subject cause of action had no

---

35. The court does not take the Trustee's testimony that at least some attorneys were at least "interested" (12/19/05 Transcript at 131:2–6) to be a contrary statement.

36. *Cf. In re Haralambous*, 257 B.R. 697 (Bankr.D.Conn.2001) (if an asset is not scheduled, it is not technically abandoned when the case is closed even if the trustee knew about the asset).

litigation value, the settlement amount produced a one-hundred percent case for creditors and the likely alternative would be a no-asset case. *See Balonze*, 336 B.R. at 170–71. Likewise, in this case the court accepts the Trustee's assertion that the subject causes of action have no litigation value. Moreover, although the Proposed Settlement will not produce a one-hundred percent case for creditors, it will produce a substantial dividend on the IRS Priority Claim (which is a claim senior in priority to Republic's claim). Finally, disapproval of the Proposed Settlement will produce a no-asset case. Under those circumstances, the Proposed Settlement may be approved notwithstanding Mary Boyer's motivation in seeking it. Permitting the Trustee to settle with the Releasees will put an end to what the Trustee believes to be useless litigation rather than fomenting such litigation as would approval of the Purchase Offer.

### G. *Approval of the Proposed Settlement*

For all of the reasons set forth above, the court concludes that the Proposed Settlement is fair, reasonable, equitable and in the best interests of this chapter 7 estate.

## VII. *CONCLUSION*

For the reasons discussed above, the Motion To Compromise shall be granted and the Objection shall be overruled. It is

**SO ORDERED.**